**BUSCH v. UNITED STATES.**

**GREIBLE v. SAME.**

Nos. 8752, 8753.

Circuit Court of Appeals, Eighth Circuit.
July 20, 1931.

Rehearing Denied Oct. 8, 1931.

P. H. Cullen, of St. Louis, Mo. (J. E. Carroll, Igoe, Carroll, Higgs & Keefe, and Abbott, Fauntleroy, Cullen & Edwards, all of St. Louis, Mo., on the brief), for appellant Busch.

Charles A. Houts, of Kansas City, Mo. (Mark A. Copeland, of Cleveland, Ohio, on the brief), for appellant Greible.

C. J. Stattler, Asst. U. S. Atty., of St. Louis, Mo. (Louis H. Breuer, U. S. Atty., of Rolla, Mo., on the brief), for the United States.

Before STONE and GARDNER, Circuit Judges, and MARTINEAU, District Judge.

GARDNER, Circuit Judge.

Appellants, who will herein be referred to as defendants, were, with one J. Sidney Green, indicted for violations of sections 215 and 37 of the Criminal Code (18 USCA §§ 338 and 88), in an indictment containing nine counts. They were charged with having devised a scheme to obtain money and property by false pretenses in connection with the sale of first mortgage real estate bonds, certificates of indebtedness, and securities of certain corporations named in the indictment, and in carrying it out, to have used the United States mails. The indictment is very long, occupying thirty pages of the printed record. The ninth count charged a conspiracy of the same defendants to violate section 215 of the Criminal Code (18 USCA §§ 88 and 338), but prior to trial, on motion of the United States district attorney, this conspiracy count was dismissed. At the close of the government's evidence in chief, on motion of the United States district attorney, counts 4 and 5 were dismissed, leaving counts 1, 2, 3, 6, 7, and 8, on all of which the jury returned a verdict of guilty as to these two defendants. Each defendant has filed a separate appeal, supported by separate briefs, but based upon a single printed record. The sufficiency of the indictment was assailed by demurrer interposed by each defendant, and the overruling of these demurrers is urged as error.

The indictment, so far as it relates to a scheme for the obtaining of money and property by means of fraudulent pretenses, representations, and promises, omitting formal parts, charges that these defendants, "having devised and intending to devise a scheme for the obtaining of money and property by means of false and fraudulent pretenses, representations and promises, from numerous and sundry persons, too numerous to mention herein, including the public generally, and particularly those who by the means hereinafter described (all hereinafter in this indictment called Victims), could be induced to give, send and pay their money and property to the said defendants and to William A. Busch and Company and the Securities Guaranteed Company, for the purchase of first mortgage real estate bonds, certificates of indebtedness and securities of The Larkspur Apartment Company, The Cardinal Apartment Company, The Superior-Payne Company, The Superior Lakeview Market Company, The Garden Court Realty Company, the Carnegie Hall Apartment and the Euclid Court Apartment, all of the City of Cleveland, in the State of Ohio, they, the said defendants, and each of them, would and did make, and cause to be made, false and fraudulent pretenses, representations and promises, through agents, by letters, circulars, pamphlets, and advertisements inserted in newspapers, to said Victims, in order to induce said Victims to give, send and pay their money and property to them, the said defendants and said companies, for the purchase of the aforesaid first mortgage real estate bonds, certificates of indebtedness and securities; that said defendants, and each of them, would and did offer for sale and sell to said Victims the aforesaid first mortgage real estate bonds, certificates of indebtedness and securities in denominations of $100.00, $500.00 and $1,000.00 each; that said false and fraudulent pretenses, representations and promises, so made and caused to be made by said defendants, and each of them, were in substance and effect as follows, to-wit:"

The indictment then, in detail and with unusual particularity, sets out in twenty numbered specifications, the pretenses, representations, and promises charged to have been made by the defendants, giving the names of the corporations, the instruments through which the alleged fraud was committed, and describing with particularity the means and methods alleged to have been employed by the defendants. The first of these specifications in substance charges that the Securities Guaranteed Company was organ-

ized for the express purpose of guaranteeing the bonds of other corporations, and having purchased the bonds, certificates of indebtedness, and securities of the Larkspur Apartment Company, the Cardinal Apartment Company, the Superior Payne Company, the Superior Lakeview Market Company, the Garden Court Realty Company, the Carnegie Hall Apartment Company, and the Euclid Court Apartment Company, would guarantee to the purchasers and holders of any and all of said bonds, the payment in full of the principal and interest thereon, and would set aside 14 per cent. of the proceeds of all bonds sold by said company and its agents, to create a trust fund; that all bonds so sold would be known and designated as trust guaranteed bonds, and that this guaranty eliminated the investment risk, and the investors would be able to buy first mortgage real estate bonds carrying a third party guaranty, both as to principal and interest, making them default proof; that trust guaranteed bonds were bonds on specific and individual properties and also trust guaranteed bonds, which meant that they carried a guaranty that made the investment secure to the holder. That this guaranty was not the guaranty of the individual corporation operating the project, but an absolute third party guaranty, which could be secured only by the application of insurance principles, through the establishment of a trust fund. That this trust fund was maintained by a premium of one-half of one per cent. of the total original bonded indebtedness of all trust guaranteed bond properties, and was paid into the fund semiannually during the entire life of the bond. That the combined total of the premiums, together with the original fund created by the guarantor, made up this trust fund which secured the guaranty. That the trust fund was held by a trust company which was under state supervision and a member of the Federal Reserve System. That the Securities Guaranteed Company was, therefore, offering investors only first mortgage real estate bonds that were trust guaranteed and whose guaranty was backed with a trust fund in the hands of a trust company, making the bondholders absolutely safe, and that in accordance with the long-established policy of the Securities Guaranteed Company, and in conformity with its guaranty trust agreement, the management and affairs of the issuing company remained under the careful scrutiny and supervision of the executive committee of the Securities Guaranteed Company, for the life of the bond. The specification then specifically negatives the truth of these representations, setting forth in detail the alleged falsity, and the knowledge of the defendants of such falsity.

The foregoing is simply referred to as disclosing the general character of the twenty specifications set out as a part of count 1. The others are quite or even more specific. In each of the other counts, the scheme as set out in count 1 is incorporated by reference. The indictment then proceeds to allege that the defendants, for the purpose of executing the scheme, and in attempting so to do, wilfully, knowingly, unlawfully, and feloniously, placed and caused to be placed in a post office of the United States, to be sent and delivered by the Post Office Department of the United States, the various letters set out in the separate counts of the indictment.

The demurrers go only to the sufficiency of the allegations charging the devising of the scheme to obtain money and property by means of false pretenses, and do not challenge that part of the indictment which charges the defendants with the use of the mails in the execution of the alleged scheme. It is urged that the indictment is bad because: (1) It fails to charge that the makers of the bonds were insolvent; (2) it fails to charge that the defendants made the representations and promises willfully or with the evil, corrupt, or unlawful intent to injure or defraud; (3) it contains a vast amount of prejudicial matter which could not be material on the issue of obtaining money or property by false pretenses; and (4) it fails to use the word "intent," or other word imputing dishonesty to the defendants. Summarizing the contention in this regard, counsel say: "Of course, the primary and principal feature upon which he relies is that the indictment fails to charge that the promises were made in bad faith, fails to charge that the representations, pretenses and promises were made with intent to defraud, or made 'wilfully.' "

The devising of a scheme to obtain money by means of false pretenses is not in itself a crime under the laws of the United States. Such an act becomes a crime, under the act here involved, when, and if, the United States mails are used in carrying out such scheme. It is well settled that the use of the Post Office Department in the execution of the alleged scheme is the gist of the offense which the statute denounces. Cochran v. United States (C. C. A.) 41 F.(2d) 193, 197; Brady v. United States (C. C. A.) 24 F.(2d) 405, 59 A. L. R. 563; Barnard v. United States (C. C. A.) 16 F.(2d) 451.

As said by this court in Cochran v. United States, supra: "While the scheme or artifice must be sufficiently set forth so as to advise the defendants with the particulars thereof, yet the scheme need not be set forth with that particularity which would be required if the scheme was the gist of the offense."

It must be borne in mind that the charge here is not the use of the mails in carrying out a scheme to defraud, but the use of the mails in carrying out a fraudulent scheme to obtain money and property by means of false pretenses. It was not material whether the makers of the bonds were solvent or insolvent, and neither was it material whether the scheme were successful or unsuccessful, nor whether the bonds sold were in fact valuable. Wine v. United States (C. C. A. 8th) 260 F. 911; Cowl v. United States (C. C. A. 8th) 35 F.(2d) 794. The representations charged, however, were material on the question of the value of the bonds. Referring to the security back of the bonds, it is charged that the defendants represented that the Larkspur Apartments were one of a group of four eight-story fireproof apartment buildings, each building containing sixty-four suites, while it is charged that they were but seven-story buildings, and each contained fifty-six apartments. Another charged representation is to the effect that the net income of the Larkspur Apartments was $98,222; whereas, in truth, it was but $63,240. Another representation involved is the rental of nineteen second floor offices in the Superior Lakeview Market Building, it being alleged that this floor was never tenanted. Another alleged representation charged was to the effect that the Superior Payne property was improved with a modern fireproof office building, and it is charged that no such office building was ever erected on the property. It cannot be said, therefore, that the allegations did not materially affect the value of the bonds sold.

The charge, in so far as the scheme is concerned, is to the effect that the defendants made false representations for the purpose of obtaining money, and if the representations were false, and known to be false when made by the defendants, it was immaterial that the securities may have had other redeeming qualities which prevented the false representations and promises made from injuring the victims. If, with intent to obtain money, a vendor should falsely palm off a commodity as being of a certain well-known or popular character, make, or ingredients, it would be no defense to say that while these representations were knowingly false and untrue, yet the article sold had other qualities which made it quite as valuable or useful as that which it was falsely represented to be. The falsity of the representations is specifically charged, and it is charged that they were made with the intent and purpose of obtaining money and property, and there is clearly no merit in the contention that the indictment does not charge a dishonest intent on the part of the defendants. While the indictment is perhaps somewhat prolix, the defendants, we think, could not have been prejudiced thereby. McBryde v. United States (C. C. A.) 7 F.(2d) 466. It states the essential elements of the offense, not merely in the general words of the statute, but with reasonable particularity of act, intent, time, place, and circumstances, so that it apprised the defendants with reasonable certainty of the nature of the accusation against them, so as to enable them to prepare their defense. The demurrers were properly overruled.

A motion for a directed verdict, at the close of all the testimony, was interposed on behalf of each defendant, and the denial of these motions is urged as error.

In considering the question of the sufficiency of the evidence, we must have in mind that the indictment charged the defendants with the formation of a scheme to obtain money by false representations. The conspiracy count was dismissed, but when such a scheme as here charged is criminally participated in by more than one individual, it constitutes of itself a conspiracy. Cochran v. United States (C. C. A.) 41 F.(2d) 193; Chambers v. United States (C. C. A.) 237 F. 513, 524; Van Riper v. United States (C. C. A.) 13 F.(2d) 961; Robinson v. United States (C. C. A.) 33 F.(2d) 238. This court, in Chambers v. United States, supra, in an opinion by Judge Sanborn, said: "Where two or more persons jointly devise and execute a scheme to defraud by the use of the mails, they may thereby become in effect partners in the criminal purpose of so using the mails to defraud. If they do, the acts of each thereafter, during the existence and execution of the scheme, done in furtherance of that execution, may become the acts of all the partners, and each may be convicted of the mailing of a letter which one of his partners caused to be mailed in the execution of the scheme."

Two classes of representations are involved in this case, both affecting the security back of the bonds. One goes to the physical

properties securing the bonds and the income derived therefrom, and the other to the guaranty of the bonds and the reserve fund supporting such guaranty.

It appears from the record that in about the year 1921 or 1922, Sloan and Greible, who had had prior to that time a number of business transactions, organized the Superior Lakeview Market Company. Greible then acquired the Hake Construction Company, later known as the Crafts Construction Company. The Greible Company, owned and controlled by Greible, was an architectural agency for the Market Company and the other companies hereinafter mentioned. It was then decided by Sloan and Greible to develop the Market property, and it was decided to place a bond issue of $425,000 on this property. The local bond brokers demanded a bonus to handle the bonds, and this led to the creation of a bondselling agency, known as the Securities Guaranteed Company. One J. Sidney Green, a bond salesman, was employed, and the so-called guaranty trust fund plan, hereinafter further referred to, was devised. The purported purpose of the creation of this fund was to guarantee the payment of principal and interest on all the bonds of the issuing companies. It was to be created and maintained by the deposit of an amount equal to 14 per cent. of the total bonds outstanding, in a trust fund, and the payment of a premium of one-fourth of 1 per cent. semiannually by the bond issuing company, on the total value of the bonds outstanding. Greible, in addition to being the architect and builder, and an organizer and officer of all the bond issuing and selling companies, was, during a part of the time, trustee of this guaranty trust fund. Green organized a sales force and began to sell the bonds of the Superior Lakeview Market Company, but complained that he was not able to sell a sufficient number of bonds with only one issue and on a retail basis, so proposed that new issues of bonds be created and that they wholesale the bonds to dealers and brokers, who, in turn, would sell them to the public. Sloan and Greible approved this proposal, and Green proceeded to circularize a list of bond dealers, while Greible proceeded to look over other properties for development. Greible formulated the construction plans and furnished Green with the figures on cost and income, which were included in and reflected by the sales literature. Acting in accordance with the plan outlined, Sloan and Greible organized building companies for the erection of buildings on ninety-nine year lease-

holds, and created bond issues thereon on the following properties and in the following amounts: Superior Lakeview Market Company, $400,000; Larkspur Apartment Company, $425,000; Cardinal Apartment Company, $425,000; Superior Payne Company, $400,000; Euclid Court Apartment Company, $122,000; Garden Court Apartment Company, $122,000; Carnegie Hall Apartment Company $122,000. In addition to these companies, Sloan and Greible organized the Realty Operating Company, to be the holding company for the stock of the various building companies. Sloan, in addition to being an officer and promoter of all of these various companies, was made trustee for the bond money under the mortgages and deeds of trust on all issues, except the Superior Lakeview Market Company.

Based upon the data and figures furnished by Greible, sales literature for advertising purposes was prepared by Green and furnished the salesmen and brokers handling these various bond issues. This printed advertising matter assumed many alluring forms and contained, among other statements and representations, the following: (1) That the Larkspur Apartments were of a group of five eight-story fireproof buildings, each building containing sixty-four suites, whereas the fact was that they were one of a group of four seven-story buildings, containing only fifty-six suites; (2) that the gross income from the Larkspur Apartments was $98,222 and the net income $63,012, and that "this is more than twice the maximum interest charge on the entire bond issue," whereas, in fact, the gross income was never $98,222, and the building had never been completed, and if completed, the gross income could not have exceeded $63,240; (3) that the Cardinal Apartment was an eight-story structure, containing sixty-four apartments, whereas it was but a seven-story structure, containing fifty-six apartments; (4) that the gross income from the Cardinal Apartments was $98,222 and the net income $71,166.50, whereas the gross income was never more than $63,240; (5) that the Superior Lakeview Market building was completed and rented, and producing income of $157,120 per annum, and that there was an annual net profit from its operation of $49,-720, whereas it was never completed and the nineteen offices were not rented on the second floor; that in fact it defaulted its interest on its first mortgage real estate bonds due July 1, 1925; (6) that the Superior Payne property was an improved, modern, fireproof office building, and was security

for $400,000 first mortgage bonds, whereas it was not improved with a modern fireproof office building, but was a property improved with a hotel building, and was held by said company under a lease only, and was not and could not be security for the bond issue; (7) that the income from this property was $49,500 per annum, whereas the gross income was only $12,000 per annum.

This literature also contained statements, among others, as follows:

"A Quarter Million Dollar untouched reserve fund known as the Guaranty Trust Fund is back of every Trust Guaranteed Bond. This fund is held by a Trust Company that is a member of the Federal Reserve System, and gives the bondholder absolute protection. * * *"

"It is possible to increase the income from your savings from 4% to 7%. By so doing, you increase the earning power of your money 75%. You can do this with absolute safety, by investing your money in Trust Guaranteed Bonds.

"When you buy a Trust Guaranteed Bond, you buy the highest type of First Mortgage Real Estate Bond that it is possible to procure, that in addition to all of the ordinary safeguards with which it is possible to surround a First Mortgage Bond of this type, has an additional protection in the form of the Trust Guaranty, or insurance of the payment of principal and interest. * * *

"The fact that it (the bond) bears the Trust Guaranty is evidence to you that it has passed all of the tests and qualifications necessary to establish its value.

"There are ten fundamental reasons why a Trust Guaranteed Bond is absolutely safe from the standpoint of value as well as from the standpoint of the repayment of principal and interest. These points of safety may be classified under two headings—namely, the facts entering into the creation of a Trust Guaranteed Bond, and the facts entering into its life subsequent to the creation.
"Trust Guaranteed Bonds Are Created Right
  Because:

"1: They are first and closed mortgages on only the highest type of income producing properties, such as office buildings, hotels, apartment houses and commercial developments.

"2: No Trust Guaranteed Bond can be more than a fifty-seven per cent loan on realty values. Thus, the real estate and buildings alone securing the mortgage must be worth seventy-seven per cent more than the amount of the mortgage.

"3: The net income from the property securing the bonds must be at least twice the interest on the bond issue, thus assuring ample funds to keep up sinking fund requirements.

"4: (This is simply descriptive of the form of bond.)

"5: They must be protected by a Sinking Fund. The borrower is required to make monthly payments into this fund equal to one-twelfth or one-sixth of the entire fixed costs, including interest, principal payments and general fixed operating expenses, thus assuring promptness of payment.
"Stay Right Because:

"1: Principal and interest are unconditionally guaranteed by the Securities Guaranteed Company. This Guaranty appears on each bond that is Trust Guaranteed.

"2: In addition to being secured by the total assets of The Securities Guaranteed Company, this Guaranty is secured by a separate Trust Fund Reserve amounting to fourteen per cent of the total outstanding bonds.

"3: This fund is held by a separate Trustee, whose function it is to protect the bondholders' interests at all times."

Another circular contained the following, among other representations:

"Trust Guaranteed Bonds offer you this ideal protection. They are so created originally that the risk is segregated. All the factors entering into their makeup are definitely controlled, and then—the risk is eliminated by the simple application of insurance practices. What then is the result?

"First: The consistent following of the same practice you have adopted with regard to the rest of your dollars.

"Second: A bond that is 'default proof' as far as you are concerned, no matter what the future may have in store for the property values underlying it."

Another printed circular contains, among its various recitals, the following: "Trust Guaranteed Bonds eliminate this chance. They take the 'if' out of the future—they protect the other nineteen-twentieth of the life of your investment—they protect you after the 'selling point'—they rob changing management of its perils. Fluctuating markets or financial crises do not affect them —they take the 'worry' out of your strongbox —they surround your investment with the

same safety in the event of loss, that fire insurance does your property in case of fire. They do not depend upon men or management. Their safety is absolute and everlasting. They are the Perfect Security."

Still another circular proclaims that:

"The founding of the Trust Guaranteed Bond by the Securities Guaranteed Company of Cleveland heralded the dawn of a new day for investors throughout the nation, for the elimination of investment risk was then made a reality. From that day on investors have been able to buy First Mortgage Real Estate Bonds that carried a third party guarantee both as to principal and interest —making them default-proof as far as the bondholder is concerned.

"Trust Guaranteed Bonds are bonds on specific and individual properties, but they are also Trust Guaranteed Bonds, which means that they carry a guarantee that makes the investment secure to the holder.

"This guarantee is not the guarantee of the individual corporation operating the project. Such a guarantee could not be an absolute guarantee because insolvency of the company would make it impossible to live up to that guarantee. A Trust Guaranteed Bond, although it is a specific bond, therefore does not carry a specific guarantee by that company, which would mean nothing. It carries only that absolute third party guarantee which can be secured only by the application of insurance principles through the establishment of a Trust Fund. This fund is maintained by a premium of one-half of one per cent of the total original bonded indebtedness of all Trust Guaranteed Bond properties and is paid into the fund semiannually during the entire life of the bond.

"The combined total of these premiums, together with the original fund created by the guarantor (The Securities Guaranteed Company) constitutes this Trust Fund which secures the Guaranty. This Guaranty Trust Fund is held by a Trust Company which is under state supervision and a member of the Federal Reserve System.

"The Securities Guaranteed Company is therefore offering to investors only First Mortgage Real Estate Bonds that are Trust Guaranteed and whose guarantee is backed with a Trust Fund, in the hands of a Trust Company, making the bondholders absolutely safe."

In another circular it is stated that:

"Investors throughout the country have long been familiar with our slogan, 'Any Bond to be safe enough for us to sell must be safe enough for us to Guarantee.'

"There is much comfort and satisfaction in knowing that every Trust Guaranteed Bond you hold is such a high grade investment that it carries the guarantee of the institution selling it. And there is still greater assurance of comfort and safety in knowing that back of this guarantee is an untouched reserve in the form of the Guaranty Trust Fund.

"This fund is held and administered by a Trust Company under state supervision and a member of the Federal Reserve System—obviously making Trust Guaranteed Bonds an insured investment of absolute safety."

Other circulars contained itemized statements of purported annual income and expenditures in connection with the operation of these various structures forming the security for the bonds in question. Their falsity has already been adverted to.

The defendant William A. Busch became connected with the sale of these securities early in 1923. He was engaged in the bond business in St. Louis, Mo., and during the time covered by the indictment, his business was incorporated as William A. Busch & Company. It it strenuously urged that while he sold some $500,000 worth of these bonds, he was acting in such sales in good faith. He continued to use the literature in the sale of the bonds up to August 2 or 3, 1925. It is an admitted fact that the trust guaranty fund referred to in this literature, with the exception of a few thousand dollars, consisted of the bonds of the issuing companies. At the time of the death of Sloan, April 19, 1925, some $60,000 of the securities and trust fund had been changed to a proper form of security; the trust fund at that time aggregating about $200,000. Green wrote Busch under date April 16, 1923, discussing at length the nature of the bonds and the security, as well as the guaranty fund, and Busch says that the first he knew of the fact that the trust fund was not maintained as represented was in March, 1925. Certain letters from him, however, furnish convincing evidence that this statement is untrue. In a letter dated June 25, 1923, from Busch to Green, it is said: "Our experience in selling these bonds has demonstrated the fact that the best way to sell them is on the guarantee. While we have in this office all of the details concerning the company and all of its issues which, of course, we have gone into thoroughly with the salesmen, in order

to sell them the proposition, we do not, however, allow them to go into the details regarding the company or their issues with the clients."

This rather clearly indicates that he regarded the representations as to the guaranty fund as very material. In a letter dated October 1, 1924, addressed to Green, he says that at the suggestion of the Better Business Bureau, he had discontinued the comparison of the guaranty bonds with government bonds, and in this same regard he says: "I am more concerned with the Blue Sky Law than with the Better Business Bureau."

In another letter of the same date, he says: "I have some misgivings as to the extent which we will be able to satisfy the State Commission or Bureaus, as to the manner in which the trust funds are held. *It is my candid opinion that they would look upon the present arrangement as a matter of bookkeeping rather than a matter of actual protection to the bondholders through the trust fund.*" (Italics ours.)

This letter clearly indicates that while the sale of these bonds was in progress in 1924, and the literature above referred to was being used in and through the mails, and long before the death of Sloan hereinafter referred to, Busch knew that the trust fund was not as represented and that it was not an insurance fund maintained with cash and securities that would be of substantial benefit to the bondholders, but was a mere makeshift or make-believe, and, as he says, "a matter of bookkeeping." In a letter dated July 2, 1924, addressed to Green, he referred to an inquiry as to what arrangement had been made regarding the appointment of a bank as trustee of the guaranty trust fund. It will be recalled that either Greible or Sloan had been acting as such trustee. In this letter he says: "I meant to ask you about this when I was in Cleveland, but it slipped my mind. On the whole, we have not had very many inquiries on this point, due to the fact that *most of my clients do not know much of business and are not keen enough to catch that important feature of the matter.*" (Italics ours.)

This letter has a flavor of the cunning and crafty, rather than of candor and good faith. It also indicates that at about its date Busch had been in Cleveland. It must be borne in mind that the first offense charged was on March 16, 1925, the second June 22, 1925, the third July 6, 1925, the sixth June 15, 1925, the seventh July 8, 1925, and the eighth July 30, 1925. In his oral testimony, he says that he had been complaining about the trust guaranty fund, and that he complained every month from the time he began until January 1, 1925. Yet, he says that he was selling these bonds during the time covered by the indictment, and circulating this advertising literature in the sale of these bonds, and had his salesmen out selling them during that time. There is also evidence in the record indicating that he knew that the representations made with reference to the physical properties and their income was untrue. On cross-examination, he testified that he had examined the Superior Payne property in June, 1925, and that he knew that it was not an office building; that he had seen the Larkspur Apartment building in June, 1924, and again in March, 1925, and knew that it was not an eight-story building, but that it was a seven-story building; that he knew that there was no income from the Cardinal Apartment building, and that it was not completed; that he knew there was nothing rented on the second floor of the Market building, and had known that as early as May, 1923, and had known that that company was not receiving $13,500 as income from the rental of the second floor, which fact he had known as early as March, 1925; that he knew from 1923 to 1925 that the Superior Payne property was not improved with a modern fireproof office building. He was in Cleveland on March 15, 1925, and saw Green and Greible, and prior to that time he had learned that the trust fund was made up largely of their own bonds. He had seen the various projects at different times, and he knew that the statements contained in the pamphlets and literature were untrue; yet, he continued to use these representations right up to and including August 2, 1925.

It should here be noted that following the death of Sloan, it developed that he had not accounted for, and no trace could be found of, the proceeds of the money realized from the sale of the Superior Payne bonds; the amount being estimated as high as $360,-000. A conference of the various dealers who were handling these bonds, including Busch, was called by Green on June 29, 1925. At this conference, the defalcation of Sloan was not only developed, but there was no assurance that the Sloan estate could or would pay the amount of the defalcation. Busch knew at that time that the Superior Lakeview Market Company was unable to pay interest on its bonds July 1, 1925, because he went with Green to the bank to see that the interest would be paid out of the

guaranty fund. He knew that this company was not receiving income from nineteen second floor offices; yet, on July 28, 1925, he sold $4,000 worth of these bonds to Leota Baer on the same representations as to the income, earnings, and safety as had theretofore been used. In fact, he testified on cross-examination that he continued the use of this advertising matter without change, to August 2 or 3, 1925. At the conference, the default in interest on the Larkspur Apartment bonds was discussed, and it was decided to pay that interest out of the guaranty fund, and he knew that the Cardinal and Larkspur Apartments were only seven-story buildings; that the Superior Payne Company property was not improved with a modern fireproof building. He also knew of the defalcation of Sloan. During July, 1925, he sold approximately $39,000 worth of these bonds, and while he testified that he and members of his family owned as an investment some of these bonds, he was offering increased commission to his agents, in an effort to dispose of the bonds which he had on hand. Various witnesses for the government testified that they received these various pamphlets or circulars from Busch or his company; that they examined and relied upon the information therein contained and the representations made by salesmen based thereon, and, relying thereon, purchased these guaranteed bonds.

The proof conclusively shows that the United States mails were used in furtherance of these sales. This evidence we think sufficient to warrant the jury in finding this defendant guilty beyond a reasonable doubt.

The testimony with reference to the participation of Greible has already been adverted to. He was one of the original organizers of the plan. He prepared and furnished to Green the data for all the advertising matter, and he knew at the time he so furnished it, that it was for use in furthering the sale of these bonds; in fact, that was Green's sole function. He also knew that these statements were in material respects false. He knew that the Superior Lakeview Market Company building was never fully completed; that it could not be receiving an income from second floor offices, but, on the contrary, he knew that it had operated at a heavy loss. He knew that the various companies were in bad financial condition as early as 1923. In 1923 to 1925, notwithstanding the bad financial condition of these concerns, Greible received a bonus of $25,000 from the Securities Guaranteed Company, in addition to a salary of $600 a month from the Greible Company and the Crafts Construction Company, which companies were owned by him, and he received $13,200 from the Greible Company as dividends. He knew that the trust fund was made up mostly of bonds of their own companies. On March 17, 1925, however, he wrote L. F. Bond, saying: "The Securities Guaranteed Company has and maintains a trust fund which specifically guarantees the bondholders in matter of default, etc."

Also that: "I think I may speak frankly by stating that the Trust Guaranteed Bonds offered through you have more value in addition to the guaranty than the average real estate bond."

A government witness testified that in an interview on March 25, 1928, Greible had said that he knew the literature was being used by Green, and he knew that the safety of the bonds was dependent upon the men and management and property values, and that the whole thing was dependent upon Mr. Sloan. He was trustee of the guaranty fund until December 4, 1924, and he knew that these bonds were being offered for sale under the representations which he had personally furnished. We think the jury was warranted in believing that he, with guilty knowledge, participated in the scheme as charged in the indictment, and he in effect caused the matter containing the false representations to be placed in the mails. United States v. Kenofskey, 243 U. S. 440, 37 S. Ct. 438, 61 L. Ed. 836; Kellogg v. United States (C. C. A.) 126 F. 323. The evidence was therefore, sufficient to sustain his conviction.

It is urged that the court erred in its instructions to the jury, but there were no exceptions saved to these instructions, and hence they must be accepted as correct and as constituting the law of the case. It is also urged that the court erred in denying certain requested instructions. It would unduly extend this opinion to discuss these requested instructions, but we have carefully examined them and so far as they are proper statements of the law applicable to the issues, we think they are covered by the instructions as given.

It is also urged that the court erred in not permitting Busch to testify that he believed the Larkspur Apartment and the Superior Lakeview Market property sufficient in value to fully secure the bonds, and to state what opinion he formed as a result of

the examination of the properties in question. The court permitted the witness to testify that he had no wrongful intent in doing what he did and in making the representations and promises which he made. The issue was whether or not the representations made were false and known by the defendant to be false when made by him. There was no prejudicial error in this ruling of the court. Neither was there any error in refusing to permit the defendant Busch to testify as to building activities in Cleveland, Ohio. This clearly had no bearing on the issues in this case.

It is strenuously urged that the court erred in admitting testimony with reference to the so-called Hoelzer and Napper transactions with the defendant Busch. The short answer to this contention is that this testimony of Hoelzer was admitted without objection. Neither was the testimony of Napper objectionable. The testimony of both of these witnesses was in any event admissible on the question of the knowledge and intent of Busch.

The defendant Greible urges that the court erred in refusing to permit the witness Moore to testify that just prior to the time Greible left for Florida, about May 1, 1925, Greible had said that the building enterprises with which he had been connected could not be carried out and that he was through with them. Greible had been permitted to testify that on or about the first of May, 1925, he severed his connection with the entire enterprise. Just why he should be permitted to multiply his testimony by proof that he had made statements to that effect, we do not understand. This would seem clearly to be self-serving. The proffered testimony was not in the nature of an exclamation, and it does not appear to relate to any incident of which it is a part. Was it said in connection with his leaving Cleveland, and at the time of his leaving, or was it said at the time of signing the power of attorney which he said he signed, or at the time of the delivery of the power of attorney, or in what connection? This declaration, to be admissible as part of the res gestæ, must have been a spontaneous utterance of the mind while under the influence of the transaction. If the declaration was the facts talking through the party, then it was admissible; but if it was the party talking about the facts, it was not admissible. We think the court properly rejected the testimony. Wigmore on Evidence, §§ 1750 and 1751; Murray v. Boston, etc., R. Co., 72 N. H. 32, 54 A. 289, 61 L. R. A. 495, 101 Am. St. Rep. 660;

Cromeenes v. San Pedro, etc., R. Co., 37 Utah, 475, 109 P. 10, Ann. Cas. 1912C, 307; Illinois Central R. Co. v. Lowery, 184 Ala. 443, 63 So. 952, 49 L. R. A. (N. S.) 1149. In any event, it could have no effect upon count 1, which charges an offense committed March 16, 1925, and as the sentences are all concurrent, this defendant cannot be said to have been prejudiced by the ruling. United States v. Trenton Potteries Co., 273 U. S. 392, 47 S. Ct. 377, 71 L. Ed. 700, 50 A. L. R. 989; Bartholomew v. United States (C. C. A.) 177 F. 902; Dickerson v. United States (C. C. A.) 20 F.(2d) 901; Hawkins v. United States (C. C. A.) 14 F.(2d) 596; Ghadiali v. United States (C. C. A.) 17 F. (2d) 236; Robinson v. United States (C. C. A.) 33 F.(2d) 238.

A review of the entire record convinces that these defendants had a fair trial, and that no errors to the prejudice of the defendants were committed.

The judgment is therefore affirmed.