## UNITED STATES v. MARIENFELD.
### No. 27064.

United States District Court
E. D. Missouri, E. D.
Nov. 23, 1953.

636

M. H. Goldschein, Sp. Asst. to the Atty. Gen., W. Francis Murrell, Asst. U. S. Atty., St. Louis, Mo., for plaintiff.

Finch & Finch, James A. Finch, Jr., Cape Girardeau, Mo., Harry C. Blanton, Sikeston, Mo., James A. Cochrane, Jr., Cape Girardeau, Mo., for defendant.

HULEN, District Judge.

In presenting motion for new trial defendant complained of: (1) failure to sustain motion to dismiss on defendant's embezzlement theory; (2) failure to admit his Exhibit 72; (3) the giving to the jury, to have with them when considering their verdict, the three papers marked Exhibits A, B and C, prepared by the Court; (4) refusal to admit testimony as to defendant's attempt, after he was indicted, to have Stokely-Van Camp recognize he owed them money (including the "income" claimed by the Government to have been omitted from defendant's tax return to evade taxes).

The defendant was in the business of selling beef and pork at wholesale under the name of Mar Meat Company, and in his meat operations engaged in a boning operation of beef and pork carcasses delivered to him by the Stokely-Van Camp Company.[1] Stokely had a contract with the Government to put up canned meat rations for the Army. It used the boned meat for that purpose. After defendant boned the meat delivered to him by Stokely, the meat was shipped to Stokely for canning. For the boning operation defendant received payment from Stokely on a pound basis. Stokely furnished the packing materials, paid the freight, and paid the storage charges on boned meat that went to cold storage.

In the boning operation there were certain by-products that could not be used in Army rations. Defendant was authorized by Stokely to sell these by-products for the "account" of Stokely. The by-products were "bones, suet, kidneys, skin, shank meat, ox joints and tenderloin." Defendant did sell these. The tenderloin, in some instances, was converted by defendant into hamburger before sale. In making hamburger, suet was added. Stokely did not authorize or have knowledge of the use of by-products, by defendant, to make and sell hamburger. Much of Stokely's meat after boning went to cold storage. The tenderloin which defendant made into hamburger was, for the most part, also placed in storage. Stokely's boned meat was placed in storage in its name, as Stokely had directed. The hamburger made from tenderloin was put in cold storage by defendant in his name without the knowledge of Stokely.

Defendant, needing more money than he could honestly make, conceived a plan to get some of it out of the boning operation being done for Stokely. Defendant proceeded to sell a part of the by-products and withheld information of such sales from Stokely by keeping and sending false records to Stokely. Income from such sales went into defendant's personal bank account and was used by him for personal purposes. All customers required a record of their purchases. Defendant furnished such a record by using "dray tickets," but kept off his office records any reference to such sales. The purchasers of meat products were unaware of defendant's fraudulent scheme. Defendant used dray tickets in each sale involved in his

---

1. Herein referred to as "Stokely."

fraud on Stokely. The dray tickets so used, unlike those used in legitimate transactions, were unnumbered. Defendant's bookkeeper testified to the practice. Defendant did likewise. The bookkeeper testified that at defendant's direction, when money came into the office, collected on the unnumbered dray tickets, he made no record of it but delivered the money to defendant. Defendant used the same method of getting funds in the sale of both converted byproducts of Stokely and unconverted byproducts of Stokely. He used the same kind of unnumbered dray tickets in sale of products that were not Stokely byproducts, which were not recorded on his books.

The income on these unrecorded dray tickets represents the income which the Government claims defendant failed to report in his income tax return, knowingly and with intent to defraud the Government of the tax on the sums of money. Such is the basis of this prosecution.

The record shows, and defendant admitted, that the income was not shown on defendant's books. It was from defendant's books that his tax returns were made by an auditor. The auditor testified he did not receive any unnumbered dray tickets from the defendant to use in making defendant's returns for the period covered by the prosecution. This testimony was not disputed by the defendant while he was on the stand. And although defendant took the stand as a witness, he did not elect to testify to the events surrounding the preparation, signing and filing of the tax returns claimed by the Government to be fraudulent.

The defense was that the money claimed by the Government to be taxable income was from the sale of Stokely products and not income under the ruling of the Wilcox case (Commissioner of Internal Revenue v. Wilcox, 327 U.S. 404, 66 S.Ct. 546, 90 L.Ed. 752). Ruling on this, defendant's prime claim, leaves no basis for the collateral claims.

Did defendant's misappropriation of proceeds from sale of Stokely's meat constitute embezzlement? Determination of this question requires an analysis of the relationship between defendant and Stokely under the facts as stated.

American Jurisprudence, Embezzlement § 20, states:

"Generally, when dealings between two persons create a relation of debtor and creditor, a failure of one of the parties to pay over money does not constitute the crime of embezzlement.

"Ordinarily, whether the relation of debtor and creditor exists depends upon the facts of the particular case. Where a principal acquiesces in his agent's practice of depositing rents collected, in his general account, and of treating the deposits as his own, such a course of dealings may divest the principal of his specific property in the deposits and establish the relation of creditor and debtor between him and his agent."

The crux of the issue here is: Where was the title to the money collected by the defendant from the sale of the meat products on the unnumbered dray tickets?

Defendant was authorized to sell the by-products for Stokely. In this capacity defendant was the bailee of these by-products, and Stokely the bailor. The bailment was for the purpose of having the by-products sold as quickly as possible after the boning of the meat and avoid storage and shipping charges. When the by-products were sold, defendant sold them in his own name and received payment, usually in check. There was no provision in the contract between defendant and Stokely indicating that defendant was to hold the particular money collected and remit it to Stokely. On the contrary, the evidence shows defendant was not required to hold this money separate. It was deposited in the defendant's account and mingled with money from the sale of defendant's prod-

ucts. Stokely knew this was the manner in which the defendant treated these funds. At least Stokely acquiesced in their being so handled. All Stokely did was to rely on defendant's keeping accurate accounts of the proceeds of these sales. Stokely expected defendant to remit in accordance with these accounts. In this situation we think defendant became the debtor of Stokely for the amounts collected on the sale of Stokely's by-products.

█ It is true, speaking generally, an agent is required to keep the funds of his principal separate from his own. If, however, he does not, and mingles his principal's and his own funds, he becomes a debtor to his principal. This, we think, for two reasons. First, since the agent cannot deliver to the principal the particular money, he is indebted to the principal to supply an equal amount of other funds; second, since the agent has done an unauthorized act, the principal is relieved of the risk of loss and this risk is shifted to the agent.

█ The principal, however, may consent that the agent handle the funds by commingling them with his own. In this case the risk of loss of the funds is shifted from the agent to the principal. This does not affect the first factor causing the relationship to be that of debtor-creditor. Stokely directed the defendant to sell the various by-products as they were created, but did not require defendant to remit each time he collected any money on the sale, but instead directed that he keep an account of such money and make a remittance at stated intervals as Stokely "billed the defendant."

In this view of the case defendant could not be convicted of embezzlement. The facts of the Wilcox case, supra, do not fit this case, and in the later case of Rutkin v. United States, 343 U.S. 130, 72 S.Ct. 571, 576, 96 L.Ed. 833, the Supreme Court said of the Wilcox case:

"We limit that case to its facts."

Before embezzlement can be a defense to a prosecution for income tax evasion, it must be shown that an embezzlement was committed. Defendant's conduct on the undisputed facts did not amount to embezzlement as a matter of law.

█ In selling the by-products for Stokely, defendant was fulfilling the role of a factor, a bailee for the purpose of selling the goods of his bailor. That defendant was entitled to no commissions we think immaterial since his compensation was measured exclusively by the number of pounds of meat he boned. In Mechem on Agency, § 2543, it is stated:

"* * * In the usual and ordinary course of business, a factor does not and is not required to keep the money received upon the sale of goods of different consignors in separate and distinct parcels, but mingles all in a common mass, and with the like funds of his own, from whatever source derived. In such cases he becomes at once a debtor to his principal and is liable to an action for the balance shown to be due by his account of sales, immediately after its rendition without any previous demand."

This is not an application of the doctrine announced in the Rutkin case to the case of embezzled funds. Our decision is bottomed on the conclusion that this is not a case of embezzlement. The defendant should have entered on his books as income the proceeds of the sale of the by-products he sold for Stokely and should have taken credit as he paid his obligations to Stokely. This, defendant falsely represented he was doing. If he did this honestly and accurately, it would leave him with no taxable income as to these transactions. If he did not pay to Stokely all the money he owed, it results in income to defendant. Defendant admittedly falsified his books to keep Stokely from ever knowing of the indebtedness. That he is still indebted to Stokely does not change the fact that it was income to defendant.

█ At the trial we accepted defendant's theory that his act in taking, for

his personal use, money from the sale of Stokely's by-products was embezzlement and not taxable income and so submitted the issues to the jury. The law did not authorize the submission. Any error in doing this was sought by defendant and is one of which defendant cannot now complain. Error, if any, was in defendant's favor and placed a heavier burden on the Government than the law called for.

■ In submitting the case we restricted the defenses of embezzlement to money from the sale of Stokely's by-products proper. Defendant was authorized to sell by-products as such. Defendant was not authorized to convert by-products into some other product, such as using tenderloin and suet to make hamburger, convert it to his own use, put it in cold storage (in defendant's name), and sell the new and converted product.

The unnumbered and unrecorded dray tickets, representing the income not included in defendant's tax return, were numerous. There were 166 of them. The jury was told, as a matter of law, that (1) income from the converted by-products (hamburger) and (2) income from sale of meat products other than by-products (which must have been defendant's property) as shown on the unnumbered, unrecorded dray tickets, was income to defendant, and all such income should have been included in defendant's tax return. But, they were told, income from sale of the by-products as shown on the dray tickets was not taxable.

Where the issue is thus narrowed on a set of exhibits, of the number here involved in the case of the dray tickets, to tell a jury that it should sift through these exhibits and separate taxable income from non-taxable income, is not due administration of justice, if the matter can properly be simplified for the jury. It could in this case. It was conceded the unnumbered dray tickets were accurate. The Court prepared a list of the dray tickets showing the sale of by-products (List A); a second list showing meat products sold other than by-products (List B); and a third list of "unknown" products because they were not identified on the tickets (List C). These three lists we gave to the jury with the unnumbered dray tickets (and all other exhibits), charging them that they were to check the lists with the dray tickets to see that the tickets were properly recorded on the lists. Defendant was satisfied on this point. We quote from the exceptions taken:

"The Court: Do you claim that I did not sufficiently inform the jury that they would verify the lists by comparison with dray tickets?

"Mr. Finch: No; that is not my point, your Honor. My point deals with the question of the by-product."

On the subject of the lists we charged the jury:

"I have caused two lists to be made for your convenience. I will give them to you to take to the jury room. One I will call list 'A'. It lists the exhibit number referring to the dray ticket, the meat products listed and the amount. You will have the dray ticket exhibit to examine. If you find the dray tickets are correct in their listing, and if you find those listed on list 'A' are by-products which the defendant was authorized to sell for Stokely, then the exhibits shown on 'A' list are sales of the by-products, the money from which sales the defendant was not required to report in his tax return because he was authorized to sell the article, he did sell it, and is legally obligated to pay that money received to Stokely.

"Now list 'B' in like manner shows the exhibit number of the dray tickets and description of product from the dray ticket. If you find the description on the list and dray tickets are correct, after comparing with the exhibits, and if you find that the meat products listed on the dray tickets listed on list 'B' are not by-products which the defendant was authorized to sell for

Stokely, then list 'B' shows sales of products, other than the by-products of Stokely, and the income from the sale of which was income to defendant which he was required to list on his tax return as such.

"Even though you find that the defendant did withhold the unrecorded dray tickets from his records, to deceive the Stokely Company, the question that confronts you is—did the defendant thereafter use all the unrecorded dray tickets to deceive Mr. Holland when he went to prepare his tax return, so that Mr. Holland would not include the amounts of income to defendant on some of the unrecorded dray tickets on his tax return. The Government claims defendant did. The defendant denies any such conduct."

We told the jury that dray tickets listed on List C could not be considered by them.

Defendant's complaint is that by giving these three lists to the jury we "over-emphasized" the unnumbered dray tickets. This assignment we find difficult to understand. The whole case revolved around the "unnumbered drays." They are the heart of the Government's case. Defendant constantly asserted their genuineness and accuracy (not content), and again and again during the trial asked questions to prove such fact. Every phase of the trial "emphasized" their importance in the case. It would hardly be possible to "over-emphasize" them in our opinion.

■ There was testimony that when knowledge came to defendant that the Internal Revenue agents were checking defendant's books and tax returns, in December of 1951, defendant called the Stokely representative on the 'phone and told him he (defendant) owed Stokely some money. Apparently the defendant not only knew what was missing from his return but what the agent would find. About a year after the return of the indictment (January 1952) the defendant sent $10,000 to Stokely. Stokely did not accept it, but put it in an escrow account. Defendant had an audit made in 1953 showing he owed Stokely money. The efforts of defendant to induce Stokely to make a claim against defendant, after the return of the indictment, we refused to admit in evidence. This is assigned as error.

There apparently is no question the defendant does owe Stokely money. There is evidence defendant has defrauded Stokely of several thousand dollars and used the mails to carry out his scheme. Defendant's obligations to Stokely are not defenses in this case. Defendant and Stokely are in the position of debtor and creditor. The defendant had a single-entry set of books. It shows a Stokely account. Defendant purchased some meat products outright from Stokely for his meat business. The account sheet shows debits and credits, all transactions run together, those that resulted from purchases of meat and the boning operations. Stokely at stated times billed the defendant for what defendant owed Stokely. The parties treated their relationship as that of debtor and creditor—they so recognized it. The existence of an unpaid balance is no defense in this case.

■ If defendant's theory, in offering evidence of his willingness to pay money to Stokely over a year after the indictment, is to show a desire to reimburse "money he had embezzled," we hold the confession and effort to restore comes too late. Defendant's act after indictment constituted an attempt to manufacture a defense. It was so far removed from the act of filing the tax returns (over five years) that it could throw no light on the question of intention. The conduct of defendant is self-serving. Busch v. United States, 8 Cir., 52 F.2d 79.

■ What we have said on the last assignment applies to the exclusion of defendant's Exhibit 72. It is simply an audit of *all* of the transactions of defendant with Stokely on the boning op-

eration, as and to the extent defendant now chooses to reveal them. It is modeled on the embezzlement theory, that *none* of the income from sale of Stokely products, no matter how the product was used, was income for tax purposes and since some of such income was included in defendant's tax return, he thereby overpaid his taxes and the Government was not defrauded.

This exhibit is destructive of defendant's position on embezzlement. It shows that even defendant did not consider the money from sale of Stokely products as Stokely money at the time of the transactions. It shows defendant recognized it as a debtor-creditor relationship. Even if the relationship were doubtful, the construction that the parties put on it is strong evidence of their understanding and what the relation is. What we said about defendant's offer to pay money to Stokely applies to this assignment also.

Order

Motion for new trial is overruled.