### GROSSMAN v. UNITED STATES. *

(Circuit Court of Appeals, Seventh Circuit. July 20, 1922.)

#### No. 2984.

1. **Post office ⬗48(4)—Indictment charging use of mails to promote scheme to obtain money by false pretenses held sufficient.**

   Indictment charging use of mails to promote scheme to obtain money by means of false and fraudulent pretenses, representations, and promises, in violation of Criminal Code, § 215 (Comp. St. § 10385), in the language of the statute, describing the unlawful scheme, the fraud, and the artifice, negativing the truthfulness of the representations, and denying the bona fide character of the schemes and artifices, *held* sufficient.

2. **Post office ⬗49—Evidence held to sustain conviction for using mails to promote scheme to obtain money by false pretenses.**

   In prosecution for use of mails to promote scheme of obtaining money by fraudulent pretenses, representations, and promises, by sale of stock in mail order corporation, evidence *held* to sustain conviction.

In Error to the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Samuel M. Grossman was convicted of using the mails to promote a scheme to obtain money by means of false and fraudulent pretenses, representations, and promises, and he brings error. Affirmed.

Benjamin C. Bachrach, of Chicago, Ill., for plaintiff in error.

Sylvester R. Rush, of Chicago, Ill., for the United States.

Before BAKER, ALSCHULER, and EVANS, Circuit Judges.

EVAN A. EVANS, Circuit Judge. The parties will be described as they appeared in the court below. Five defendants were charged in seven counts with violating section 215 of the Criminal Code (Comp. St. § 10385). The jury found the defendant Grossman guilty on one count and not guilty on all others. All other defendants were acquitted.

Two assignments of error are urged: (a) Insufficiency of the indictment; and (b) want of evidence to support the verdict.

*Indictment.* Basing his contention on the holding in Dalton v. United States, 127 Fed. 544, 62 C. C. A. 238, counsel for defendant chal-

---

⬗For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Certiorari denied 258 U. S. ——, 43 Sup. Ct. 95, 67 L. Ed. ——.

lenge the sufficiency of the indictment, the material parts of which are set forth below.[1]

The attack on the indictment scarcely requires consideration, and would not have been presented, but for the somewhat unfortunate

[1] "The grand jurors for the United States of America, impaneled and sworn in the District Court of the United States for the Eastern Division of the Northern District of Illinois, at the April term of said court in the year 1919, and inquiring for said district and divison, upon there oath present, that Samuel M. Grossman, Ellen Schubert, Asher J. Goldfine, David Grossman, and Hyman Himmelstein, each late of the city of Chicago, in said division and district, hereinafter called defendants, *before and on May 4, 1916, did devise a scheme and artifice to obtain money*, from a certain class of persons then resident in divers states of the United States, *by means of false and fraudulent pretenses, representations and promises.*

"That is to say, the persons whom said defendants should, by the means hereinafter described, induce to send and pay their moneys to said defendants, under the name of the Riley-Schubert-Grossman Co. (a corporation the business and affairs of which were then and there under the management and control of said defendants), for subscribing for and purchasing shares of stock in said corporation, *upon pretenses, representations, and promises to be made to said persons by said defendants,* in the name of said corporation, *through and by means of agents of said corporation,* to the effect that the business of said corporation (it being the business of dealing in numerous kinds of merchandise upon the mail order plan) *had been, was, and would be a successful and paying business, that said persons would be greatly benefited financially by subscribing for and purchasing said stock, in that large annual dividends would be paid to them thereon from the earnings of said corporation in carrying on its said business, and that such persons would be further benefited in that, as holders of shares of stock in said corporation, they would be given the privilege of buying and would be able to buy, from said corporation, merchandise at greatly reduced rates, and at rates less than the prevailing market rates for such merchandise;* said defendants then and there intending, by said pretenses, representations, and promises, to have said persons understand and believe that the investment of their moneys in such shares of said stock would, for the reasons aforesaid, be a paying and profitable investment, that said stock was of great value, not only on account of such earnings and dividends, but on account of the privileges aforesaid which holders thereof would enjoy.

"Which said pretenses, representations, and promises, as said defendants, when so devising said scheme and artifice and at the times of committing the several offenses in this indictment hereinafter mentioned, well knew, were and would be false and fraudulent pretenses, representations, and promises, in this, that said business of said corporation had not been, was not, and would not be in any sense profitable, but had been, was, and would be a losing venture, and in this, that no dividends had been or would be earned upon such shares of stock in said corporation, and in this, that none of the holders of said shares of stock had been or would be given the privilege of buying merchandise from said corporation at reduced rates or at rates less than the prevailing market price for such merchandise as they should purchase, or any other valuable privilege whatsoever, and in this, that said shares of stock, for the reasons last aforesaid, were and would be of no commercial value whatever, either on account of earnings or of bona fide dividends, or because of any purchase privileges that had attached or would attach to the ownership thereof; the truth being, as said defendants, at the several times of so making such false and fraudulent pretenses, representations, and promises and committing the said several offenses, well knew, that said corporation was a corporation organized merely for stock-selling purposes, and whatever business had been or should thereafter be carried on by said corporation had not been and would not be carried on in good faith, but merely to assist in such sales of the stock of said corporation, and only as a part of said scheme and artifice."

views expressed in the Dalton Case. Parts of that decision would hardly meet with the approval of this court at this time; but the case is repeatedly cited, not in respect to matters therein found that are eminently sound, but in respect to a somewhat forced and technical construction of language appearing in an indictment unfortunately and carelessly drawn.

It is, however, unnecessary to withdraw from any position taken in the Dalton Case in order to uphold the indictment under consideration. In the Dalton Case the indictment was brought under section 5480, R. S. (Comp. St. § 10385), while the present charge was drawn under section 215 of the Criminal Code. For the distinction between these two offenses, see United States v. Young, 232 U. S. 155, 161, 34 Sup. Ct. 303, 58 L. Ed. 548.

Moreover, the language in the two indictments is different, and in the particular wherein the Dalton indictment was criticized. To illustrate: It is contended that the pleader in the present indictment merely described the class of persons intended to be defrauded when he set forth "what purports to be a description of the scheme or artifice," and reliance is placed upon the language of the opinion in the Dalton Case, found on page 547 of 127 Fed. and page 241 of 62 C. C. A., where it is said:

"It is clear that this statement in the indictment was intended to describe, and was necessary to the definition of the class of persons intended to be defrauded in some way. The allegation defines and limits the class of persons. * * * Thus far there is a total want of information of the character of the scheme and artifice to defraud, unless it may be said that the defendant is informed by implication of the essential elements of the offense."

[1] Assuming, now for the purpose of the argument, that the foregoing is accurately descriptive of the indictment there under consideration, it is apparent from a casual reading thereof that the present indictment is not subject to the same criticism, nor to the same doubt and uncertainty. In other words, the pleader here was specific and definite. He first charged the offense in the language of the statute, then (in what in the margin is paragraph 2) the unlawful scheme, the fraud and the artifice, is specifically set forth, and finally (in paragraph 3) the pleader negatived the truthfulness of the representation so used to sell the stock and the merchandise, and denied the bona fide character of the schemes and artifices. The asserted weakness of the Dalton indictment seems to have been studiously avoided.

[2] *Sufficiency of the Evidence.* It will be impossible to consider all the facts and inferences (some stronger than isolated facts) that bear upon this issue. Counsel for defendant, with customary and commendable energy, have eliminated much of the evidence, admitting what it would have taken many printed pages of the transcript to establish, and have asked us to review carefully the facts, and to reconcile them with the presumption of innocence, if we can consistently do so. In complying with this invitation, we have studiously endeavored to view the wreck, not from the rear, but through the colored glasses of the optimistic promoter, whose inexperience and gullibility, it is claimed, went hand in hand. Notwithstanding this labored

effort, during which we groped from one fact to another in an earnest effort to keep defendant in sight of good faith, we were compelled, long before we were through with the tale, to capitulate and admit the presence of facts too damning to be explained on the theory of the promoter's gullibility or lack of experience, and to conclude, not only that there was a jury question presented, but that the verdict of the jury could hardly have been otherwise. While this examination of the evidence has been made because of the earnestness of counsel in requesting it, supported by the carefully prepared brief, we feel justified in again calling attention to what was said in Applebaum v. United States (C. C. A.) 274 Fed. 43, and in again directing counsel's attention to the law, which requires the jury and not the court, particularly not the appellate court, to determine these issues of fact.

While not uncontradicted, there is evidence that supports this statement: Defendant, a merchant with a somewhat varied career, including the conduct of an installment furniture business, with trading stamps as premiums, organized the Riley-Shubert-Grossman Company in 1914. He stated that a numerous title was selected, so that "it would have a human interest, reaching out to various classes of people, including Irish, German, and Jewish names." As a matter of fact, he was the sole owner of the company, though he elected a sister-in-law as secretary, and treasurer. Grossman transferred to the new company his installment furniture and trading stamp business, worth perhaps $30,000, for $99,000, payable in stock of the company; the few remaining shares going to two or three other persons for which no consideration passed. Grossman's debts, amounting to $14,000 or $15,000, were assumed by the company, and Grossman was voted a salary of $15,600 per year. The capital stock was soon (fall of 1914) increased to $300,000, and on August 20, 1915, to $1,000,000, and in 1916 to $5,000,000.

The story of the company's achievements may be found in the following table:

### Receipts.

| | |
|---|---|
| Sales of preferred and common stock | $1,112,000.00 |
| Sales of profit-sharing certificates | 997,000.00 |
| Mail order sales | 1,145,000.00 |
| Sale of gold bonds | 9,000.00 |
| Total, about | $3,263,000.00 |

### Disbursements.

| | |
|---|---|
| Spent in catalogues and advertising, about | $ 600,000.00 |
| Commissions and collectors' salaries for selling profit shares and preferred and common stock, about | 402,000.00 |
| Operating expense | 597,000.00 |
| Net merchandise purchases | 1,653,000.00 |
| Dividends | 11,000.00 |
| | $3,263,000.00 |

The company was adjudged a bankrupt in July, 1918, its total assets being $18,973.20, and the liabilities being $180,000, which did not include any possible claim from any of the thousands who held several million dollars of stock and so-called profit shares. Notwith-

standing the capital was at all times impaired, dividends were declared and paid, and future dividends freely promised. In fact, the stock provided that "dividends on stock are to be paid semiyearly" and "guaranteed." A repayment of face value of the stock, with interest, was provided for on 30 days' notice, or the holder was given the privilege of purchasing furniture for the full amount of the stock. Grossman's action in declaring dividends when his capital was impaired, his extensive advertisement of the dividend-paying qualities of the stock, as well as the unjustifiable and extravagant promises of large future dividends, might alone have branded the defendant and his business as wanting in honesty, integrity, and good faith. The small amount thus paid was used as a lure or bait with which to attract the unwary and the inexperienced. Other literature was equally deceptive and alluring. The words "profit sharing" and "co-operation" were strongly played up, and circulars under the caption of "A Little Story with a Big Idea" and "The Story of a Success and an Opportunity" supplemented the persistent efforts of the stock salesmen. The mail order catalogue was deceptive and untruthful, and the references to other mail order houses in other literature, supplemented by the stronger statements of the salesmen, were calculated and intended to inflame the imagination and appeal to the credulity of a class of people altogether too numerous and generally composed of individuals who can ill afford to lose the sum invested.

In view of the foregoing facts, it is hardly conceivable that defendant could have circulated in good faith a pamphlet telling of the great growth of the company and extolling himself as follows:

"The Amazing Growth of the Riley-Schubert-Grossman Company is the Wonder of the Mail-Order World.

"Already the newspapers of the country are noting the rise of the master merchant—the head of this fast-growing concern—S. M. Grossman—as one of the brainiest business builders of our time. They are associating his name with the steel kings—the cotton kings—the corn kings—and drawing the parallel of how this new, young, vigorous merchant king is rapidly outstripping many of his famous predecessors. The speed with which he is accomplishing big things is dazzling. He has a consummate grasp of every detail of a corporation that is almost an industry in itself—that to many would seem fathomless."

It is unnecessary to recite in further detail the unfortunate record of this company's history. Doubtless sufficient has already been related to show that the jury might well have found the defendant was in a scheme to defraud and used the mails extensively in furtherance thereof. The verdict is amply supported by the evidence.

The judgment is affirmed.