## HOLMES v. UNITED STATES.
### No. 11766.

Circuit Court of Appeals, Eighth Circuit.

March 4, 1943.

Rehearing Denied April 7, 1943.

See, also, 126 F.2d 431.

Leo S. Holmes, pro se, for appellant.

Emmet L. Murphy, Asst. U. S. Atty., of Omaha, Neb. (Joseph T. Votava, U. S. Atty., of Omaha, Neb., and Irvin Goldstein, Atty., Department of Justice .of Washington, D. C., on the brief), for appellee.

Before GARDNER, JOHNSEN, and RIDDICK, Circuit Judges.

GARDNER, Circuit Judge.

Appellant, Leo S. Holmes, was indicted with George W. Hauser and J. W. McCormack in an indictment containing 19 counts. Count I charged them with the violation of the Securities Act of May 27, 1933, Section 77q (a) 1, Title 15 U.S.C.A., while counts 2 to 18, inclusive, charged violations of Section 338 of Title 18 U.S.C.A. by the use of the United States mails in execution of a scheme to defraud. Count 19 charged a conspiracy under Section 88, Title 18 U.S.C.A. Count 2 was dismissed during the trial and appellant was found guilty under all the remaining counts and sentenced to imprisonment. Holmes prosecuted an appeal to this court based upon the primary record and we affirmed. Holmes v. United States, 8 Cir., 115 F.2d 528. On appeal to the Supreme Court the cause was remanded with instructions to enter an order affording reasonable opportunity for the preparation, presentation, settling and filing of a bill of exceptions and for the redetermination of the case if a bill of exceptions were filed. Such a bill has been prepared and filed, and the cause has been briefed and orally argued. Hauser and McCormack, subsequent to the empaneling of the jury, but before the opening statements of counsel, entered pleas of nolo contendere and were not tried with appellant. Appellant will now be referred to as defendant. He alone stood trial and is, therefore, the only appellant.

The same scheme to defraud is common to all counts. Count I charges a violation of the Securities Act of 1933. It alleges that the defendants in Omaha, Nebraska, engaged in the sale of securities and notes of First Mortgage Acceptance Corporation denominated "participating certificates", and in doing so devised and employed a scheme and artifice to defraud specifically named persons, and in furtherance of the fraudulent scheme made use of the United States mails. The scheme to defraud is set out and described in the indictment in great detail. It charged defendants with the devising of a scheme and artifice to defraud through many ways by misrepresentation of material facts with reference to the "participating certificates" and the securities of the First Mortgage Acceptance Corporation. Such fraudulent misrepresentations included representations: (1) that the securities were a safe and sound investment; (2) that the First Mortgage Acceptance Corporation had $3.00 or more in assets for every $1.00 invested in its securities; (3) that it derived a profit from the purchase of mortgages with the proceeds of the sale of securities; (4) that the corporation was in good financial condition; (5) that First Mortgage Acceptance Corporation had always paid the interest provided for by the terms of its securities and the prospective purchasers would receive interest as provided by the terms of the securities; (6) that the securities issued by First Mortgage Acceptance Corporation were secured by first mortgages on real estate purchased with the proceeds of the sale of securities.

That said representations were false and as a matter of fact the corporation was insolvent and had never earned a profit; that it derived no profit from any source but continually suffered a loss; that it never had any earnings with which to pay interest; that the corporation was insolvent and had used funds invested to redeem some securities; that only a small portion of the funds invested were used to purchase first mortgages on real estate or any other property. The indictment charges the use of the mails in furtherance of the scheme to defraud; it specifically charges that the defendant caused the United States mails to be used by inserting an advertisement in a newspaper which would be and was sent through the mails to various stated persons. Counts 3 to 18, inclusive, charge mail fraud violations. They are identical in form except that the mail matter deposited in the mail is not the same and is specifically described. Count 19 charges a conspiracy to violate the Securities Act and the mail fraud statute in effecting a scheme to defraud and also embodies the scheme by reference to the first count. Seventeen overt acts are charged.

Defendant seeks reversal on substantially the following grounds: (1) the court erred in overruling his demurrer to the indictment; (2) he was deprived of the full number of peremptory challenges to which he was entitled; (3) he was prejudiced because his co-defendants were permitted to plead nolo contendere in the presence of the jury; (4) the evidence is insufficient to sustain the verdict of guilty; (5) that through the instrumentality of the conspiracy count he was twice convicted of the same offense; (6) that the court erred in rejecting testimony as to his intent; (7) that his business being intrastate was confined to Nebraska and the Securities Act of 1933 does not apply; (8) the court erred in its instructions to the jury; (9) that the sentence imposed is invalid because excessive.

So far as counts 3 to 18 are concerned, it may be said that they are in conventional form. The scheme as alleged in the indictment was to sell First Mortgage Acceptance Corporation securities as a safe and sound investment when in fact they were not. An indictment is sufficient if the defendant is able to ascertain from the charge what he is called upon to answer, to prepare his defense, and if necessary to plead the judgment on such charge as a bar to a second prosecution for the same offense. Bogy v. United States, 6 Cir., 96 F.2d 734; Hass v. United States, 8 Cir., 93 F.2d 427. The test is whether it contains every element of the offense intended to be charged and sufficiently apprises defendant of what he must be prepared to meet, and not whether the indictment might possibly be made more definite and certain. United States v. Shreveport Grain & Elevator Co., 287 U.S. 77, 53 S.Ct. 42, 77 L.Ed. 175; Hagner v. United States, 285 U.S. 427, 52 S.Ct. 417, 76 L.Ed. 861. In the instant case it was not essential to allege the violation of a particular statute as the offense charged is to be determined and classified by the allegations of the indictment. Hammer v. United States, 271 U.S. 620, 46 S.Ct. 603, 70 L.Ed. 1118. In each count of the indictment the falsity of the scheme is charged. This necessitated proof of the fraudulent character of the scheme and the falsity of the representations and a denial of the bona fide character of the scheme. Grossman v. United States, 7 Cir., 282 F. 790. An inspection of the indictment discloses that it contains a detailed description of the scheme to defraud, names the persons to be defrauded specifically and by class, and the means devised and used to that end. Each count sets forth facts constituting the scheme to defraud and charges the use of the mails for the purpose of promoting it. So far as the mail fraud counts are concerned, the gist of the offense was not the devising of a scheme to defraud but the use of the United States mails in furtherance of such scheme. Cochran v. United States, 8 Cir., 41 F.2d 193; Busch v. United States, 8 Cir., 52 F.2d 79; Hartzell v. United States, 8 Cir., 72 F. 2d 569. The scheme set forth is sufficient to advise the defendant with the particulars thereof and this is sufficient. United States v. Momsen, 7 Cir., 115 F.2d 635. We think the court did not err in overruling defendant's demurrer.

Defendant claims error because only 10 peremptory challenges were allowed to the three defendants. It is first to be observed that no objection was made to the procedure. The court was not called upon to make any ruling with reference to the procedure and the record is silent as to how the defendants allocated the 10 challenges among themselves. At the trial this defendant was represented by able counsel, three in number, but they interposed no objections and made no requests of the court for a ruling and the matter is for the first time raised in this court. Having failed to secure a ruling on the matter in the trial court, defendant cannot here be heard to complain. Aside from this, however, the procedure followed was that provided by the statute. Section 424, Title 28 U.S.C.A. provides that where several defendants are jointly indicted and tried they are deemed a single party for the purpose of all peremptory challenges. This statute was upheld by the Supreme Court in Schaefer v. United States, 251 U.S. 466, 40 S.Ct. 259, 64 L.Ed. 360. Nothing in the Constitution requires Congress to grant peremptory challenges to the accused and we have held that courts are not limited to any particular method of exercising peremptory challenges which Congress has granted defendant. Philbrook v. United States, 8 Cir., 117 F.2d 632. See, also, Wood v. United States, 299 U.S. 123, 57 S.Ct. 177, 81 L.Ed. 78; Stilson v. United States, 250 U.S. 583, 40 S.Ct. 28, 63 L.Ed. 1154.

After the jury had been selected and sworn defendants McCormack and Hauser entered pleas of nolo contendere in the presence of the jury and the Judge

explained the effect of these pleas. Defendant contends that this procedure was prejudicial to him. Here again, though represented by counsel, no objection was made to the procedure and the court was not called upon to make any ruling. Certainly when no objection is interposed it cannot be said to be prejudicial error to permit a co-defendant to enter a plea of nolo contendere in the presence of the jury, especially when the court explains the effect of such plea. Kelling v. United States, 8 Cir., 121 F.2d 428.

The Government contends that the bill of exceptions is incomplete and that it does not show that there was a motion for a directed verdict and, hence, we are precluded from considering the question of the insufficiency of the evidence. In the circumstances of this case we put aside any consideration of these contentions.

The jury having found defendant guilty we must assume that all conflicts in the evidence have been resolved in favor of the Government. It is not our province to pass on conflicts in evidence, credibility of witnesses, plausibility of explanations by defendant, nor the weight of the evidence. If there is substantial evidence viewed in a light most favorable to the Government to sustain the verdict, then it ought not to be set aside. Galatas v. United States, 8 Cir., 80 F.2d 15; Cravens v. United States, 8 Cir., 62 F.2d 261; Shama v. United States, 8 Cir., 94 F.2d 1; Zottarelli v. United States, 6 Cir., 20 F.2d 795.

Defendant contends that there was no evidence to sustain the allegations that no profit was earned by First Mortgage Acceptance Corporation in the purchase of mortgages and that its so called profits were fictitious, the company in fact being insolvent; that it derived no benefit from the farms transferred to it by the Nebraska Agricultural Corporation; that sums were not withdrawn by defendant; that he caused First Mortgage Acceptance Corporation to pay $308,479.32 for mortgages; that defendants made false representations as to payment of interest and redemption of certificates; that for the purpose of inducing purchase of securities it was the intent of defendants to make false and fraudulent representations by means of letters, circulars, checks and printed documents sent through the mails and false statements of material facts. It is also asserted that no fraud was shown, that questions of value and of accounting methods were involved and that reasonable differences of opinion could exist and, hence, the idea of fraud entering into the transaction was utterly impossible. These contentions of defendant result in a claim of good faith even though he may have been mistaken in judgment and that no evil intent or motive could properly be inferred from the evidence.

In 1931 defendant, Hauser and John P. Ashley organized the First Mortgage Acceptance Corporation with the declared purpose to borrow or raise money, to issue and purchase evidences of indebtedness, to purchase real estate and mortgage the same, and to deal in property of every description. On September 12, 1932, the capital stock was increased from $25,000.00 to $100,000.00 not more than $92,000.00 of which was to be preferred stock and the balance common stock. Defendant and Hauser acquired practically all of the outstanding stock with no money investment other than the original incorporation expenses. Defendant was president and director, and Hauser was vice-president. In March, 1933, defendant and Hauser turned over the so-called Happy Hollow Apartments to the First Mortgage Acceptance Corporation, each receiving "participating certificates" and shares of stock for the property. This property appears on the books at a valuation or credit of $48,500.00 offset by a first mortgage of $17,820.00, a second mortgage of $6,192.56, accrued taxes of $990.09, a credit to J. W. McCormack Company of $2,649.72, bills of $49.37, profit to Holmes $8,976.11, profit to Hauser $8,976.11, taxes accrued and assumed $170.04, rent paid $2,900.00. For their profit each received $5,000.00 worth of stock and $4,000.00 of "participating certificates". Conservative Mortgage Acceptance Corporation was incorporated in Illinois in 1936, and defendant and Hauser actively managed and controlled it. The National Insurance Investment Corporation was incorporated in Nebraska in 1935, and in 1937 its name was changed to Nebraska Agricultural Corporation. It, too, was controlled by defendant and Hauser. After the organization of the First Mortgage Acceptance Corporation, defendant and Hauser commenced offering for sale "participating certificates" in it to investors throughout Nebraska. These certificates gave the investor the privilege of participating in the income derived or received from the loan and use of funds.

131

A definite return of interest and a definite date of maturity were specified. Representations were made that First Mortgage Acceptance Corporation was solvent; that it had $2.00 or $3.00 for every $1.00 of outstanding certificates; that its assets consisted of good first real estate mortgages purchased at a discount. Representations were made that the certificates were as good or better than government bonds; that the company was earning from 16% to 24%; that it collected payments of principal and interest on the mortgages monthly and was progressing nicely. These representations were made by salesmen upon the instruction of defendant and Hauser, and on numerous occasions defendant made them personally. Printed statements were circulated by salesmen emanating from defendant. One of these consisted of a "condensed financial statement" for 1937 showing reserve and surplus of $14,680.33, and showing reserve and surplus for 1938 of $95,787.25. One of these printed statements gives as inducements or reasons for purchasing: (1) safety: because of $3.00 or more security for each $1.00 invested, with other reassuring reasons for intrinsic safety and worth; (2) profits: 12% per year "positive" profit, checks issued monthly at 1% per month earnings from discounts and interest on mortgages equalling more than double the certificate profit requirements; (3) liquidity: gold certificates cashable on 60 days notice, maturing in 30 months, short time mortgages making it possible to liquidate the entire corporation in 24 months or less.

Salesmen were furnished with "kits" which contained information and material intended for use by the salesmen in the promotion of the sales of certificates. In this "kit" a "comparative statement" showed an increase from $35,200.00 in 1932 to $1,047,148.98 in 1937, with the statement that "the sound financial principles under which it (First Mortgage Acceptance Corporation) operates have made its certificates a favored investment with hundreds of Nebraska families". A second "comparative statement" showed an increase in the amount of interest paid to certificate holders from $845.15 in 1932 to $68,741.12 in 1937, and it is said in this statement that holders of certificates receive a reasonable return for the use of their funds and that the principal has been kept safe. A third statement concerns the annual redemption of certificates and states that certificate holders have received interest and principal when due and "have had their money kept safe". In the "kit" there were instructions to salesmen, a "sales canvass" in which it was stated that First Mortgage Acceptance Corporation purchases from real estate dealers first mortgages which represent final payment due under purchase contracts after the balance of the purchase money has been paid; that First Mortgage Acceptance Corporation takes every possible safeguard known to insure ample security and so arranges the mortgage that the principal is reduced at regular periods, safeguarding against depreciation and reduction in property values; that the character of the property and the responsibility of the firms from whom mortgages are purchased is considered by First Mortgage Acceptance Corporation as an important factor; that profits of First Mortgage Acceptance Corporation are made in the same manner as all financial companies, the first profit being the discount from the face of the mortgage when it is purchased, the next source of revenue is the interest charge on the mortgage, and the third the turnover of the money; that whenever payments are received they are used to purchase additional mortgages; that the history of the company is outstanding and proved its worth as a Nebraska institution, and a comparison of the advantages of safety and return with other similar institutions proved its desirability.

Generally the representations stressed a greater field for profitable operation, the safest possible type of commercial investment—first real estate mortgages, and interest yield larger every year than many other commercial companies who do not offer the safety features found in First Mortgage Acceptance Corporation. A list of mortgages showing ratio of property values to mortgages held as of August 1st, 1934, was included, it being stated that in no instance was the amount of the mortgage more than one-third of the stated value of the property securing it. At a sales meeting on January 8, 1939, defendant said: "On the first of January of this year our financial statement, our collateral in ratio to certificates outstanding, will be better than any previous year in our history. That's because of the cumulative effect of rediscounting and reinvesting in mortgage paper.

132

Our financial statement will be better than any previous year."

Defendant made records to reproduce a general sales talk which very thoroughly described and emphasized the alleged safety of the method employed by the management of the First Mortgage Acceptance Corporation.

It was, of course, incumbent upon the Government to prove the falsity of the statements and representations made and it is claimed that contrasted with these representations of security, solvency, earnings and net worth the jury had before it facts that sustained a finding that the financial condition of First Mortgage Acceptance Corporation was that of insolvency with assets of little value. On this issue the Government relies largely on the testimony of Harry A. O'Hara, a public accountant, who in May, 1938, was employed by defendant and Hauser to make an audit of the affairs of First Mortgage Acceptance Corporation for the purpose of verifying the condensed balance sheet and certifying to its correctness. This balance sheet showed assets of $1,252,916.51, and liabilities of the same amount with an item of surplus and reserves of $95,787.25. O'Hara prepared a report which he submitted to defendants showing a deficit of $408,966.21. This was in May, 1938. The discrepancy, he explained, resulted from setting up the mortgages held by First Mortgage Acceptance Corporation at their cost and not at their face value and disallowing as a profit the discount between the face value and the actual cost. In his report he includes among the assets an item of $220,000.00 representing an agreement entered into between First Mortgage Acceptance Corporation and Conservative Mortgage Acceptance Corporation under the terms of which Conservative Mortgage Acceptance Corporation was to transfer to First Mortgage Acceptance Corporation a first mortgage note in the amount of $220,-000.00 upon the payment of liabilities of Conservative Mortgage Acceptance Corporation in the amount of $20,909.89. This liability was never paid nor was the mortgage executed but the First Mortgage Acceptance Corporation carried it on its books as an asset at $220,000.00. As this item was not an asset it increased the deficit to $628,-966.21. This item was included in the assets in the "condensed financial statement" which First Mortgage Acceptance Corporation printed, published and distributed.

When O'Hara declined to issue a statement including this item in the surplus, defendant refused to use the O'Hara report. The principal assets of First Mortgage Acceptance Corporation were mortgages of two classes; the first-mortgages executed by individuals, and the second-mortgages executed by Conservative Mortgage Acceptance Corporation. The books of First Mortgage Acceptance Corporation were kept under direction of defendant and Hauser, and the books of the Conservative Mortgage Acceptance Corporation were kept by the same employees in the office of First Mortgage Acceptance Corporation, who were paid by First Mortgage Acceptance Corporation. On December 21, 1938, the totals of the face amount of the mortgages held by First Mortgage Acceptance Corporation was $1,145,587.04, and of this aggregate amount Conservative Mortgage Acceptance Corporation was mortgagor on mortgages of the face amount of $997,875.-00, which includes the $220,000.00 mortgage to be executed. The face amount of the individual mortgages was $147,712.04. These individual mortgages were acquired by First Mortgage Acceptance Corporation from Conservative Mortgage Acceptance Corporation, and J. W. McCormack. These mortgages came to First Mortgage Acceptance Corporation two, three and four times with a purported discount profit realized each time and on all of which less than $2000.00 in cash was received by First Mortgage Acceptance Corporation. Exhibit No. 769, the Griffin mortgage, is referred to by the Government as typical and may be so considered. This was first received December 1, 1932, and the price at which the mortgagor purchased the property is shown on the books as $1,750.00, while the amount of the mortgage was $310.00. Next this mortgage is shown as having been purchased May 10, 1933. The purchase price of the property appears at $1,750.00, but the mortgage as $250.00. Next it was purchased November 7, 1935, for $250.00 and the purchase price of the property appears as $750.00. Again it appears on the ledger as having been purchased February 3, 1938, at $438.00. The first three ledger accounts show payment in full, but no cash was in fact paid on interest or principal. This mortgage and the notes were not only in default but outlawed and apparently uncollectable. Conservative Mortgage Acceptance Corporation mortgages were secured principally on J. W. McCormack's Westmoreland and

Boulevard Manor Addition near Cicero, Illinois. Prior liens for general and special taxes against these properties totalled $557,731.22, without interest or penalties. The property was appraised by William D. O'Malley, qualified appraiser of real estate in that vicinity, at $861,550.00, so that the First Mortgage Acceptance Corporation had $997,875.00 in mortgages on property worth $861,550.00 with prior liens in the amount of $557,731.22. The difference between the value and the amount of the taxes due is $303,818.78, but if consideration is given to the interest and penalties on the taxes it is doubtful if there is any equity in the property. This property was the security for almost a million dollars in mortgages.

The method employed by First Mortgage Acceptance Corporation was to mark a mortgage "paid" when it became due and charge Conservative Mortgage Acceptance Corporation on open account. Then Conservative Mortgage Acceptance Corporation made payments in more mortgages and some cash. The income tax reports for 1923 to 1938 of First Mortgage Acceptance Corporation show losses as follows:

| | |
|---|---|
| 1932 | $ 6,540.92 |
| 1933 | 13,096.38 |
| 1934 | 23,512.52 |
| 1935 | 42,558.63 |
| 1936 | 66,371.58 |
| 1937 | 95,048.24 |
| 1938 | 43,994.57 |

From 1931 to 1938 First Mortgage Acceptance Corporation received in cash from all sources $1,434,449.66, while the total cash disbursements during the same period amounted to $1,431,154.18. Of the total cash receipts $1,258,537.43 came from the sale of "participating certificates". In all $2,306,193.64 of "participating certificates" were issued, of which $802,297.62 were in redemption of maturing certificates. On December 31, 1938, about six weeks before the close of the business, $1,329,687.-62 in "participating certificates" were outstanding. Defendant took out of the business in cash $73,695.66 from 1931 to 1938, and Hauser $75,539.22. The sale to the public of securities of spurious or fictitious origin and background, upon representations far exceeding in promise their worth or value, is a well known practice. Representations as to value, soundness and worth of securities may go so far beyond what may be considered the proper limits of the exaggerating enthusiasm of the normal salesman, or the mistaken judgment of the honest man, as to impress them with the badge or mark of fraud. McCutchan v. United States, 8 Cir., 70 F.2d 658; Busch v. United States, 8 Cir., 52 F.2d 79; Foshay v. United States, 8 Cir., 68 F.2d 205; Stephens v. United States, 9 Cir., 41 F.2d 440. The difference between the established and well known facts and the representations made by defendants with reference thereto are so great as to shock the conscience of the man of the street. In view of the knowledge which defendant had as to the actual facts and actual financial condition of First Mortgage Acceptance Corporation there is little reason for a claim that his representations were honestly made or were without fraudulent intent.

There are some details in which defendant contends that the allegations of the indictment were not proved. It is enough to repeat that the gist of the offense, the use of the mails, was proved, and the scheme to defraud was proved substantially as alleged. All the allegations relative to false representations need not be proved as a part of the scheme. A scheme to defraud is necessarily made up of numerous elements, no particular one of which need be proved if sufficient is shown to constitute the scheme. The use of the mails was stipulated as well as proved and there was substantial evidence warranting the jury in finding the existence of the scheme to defraud as alleged.

It is, however, claimed that there was no substantial evidence that the defendant inserted, or caused to be inserted, an advertisement in the Freemont Morning Guide, published at Freemont, Nebraska, as charged in count I of the indictment, which advertisement was substantially as follows: "Wanted to buy * * * first real estate mortgages on farms and homes. Write Box 189, c/o Freemont Morning Guide". The indictment charged that the newspaper was mailed to George Galbraith at Hooper, Nebraska, and that this was done pursuant to the scheme to sell securities. Galbraith was a witness. He traded a mortgage for certificates. A Mr. Beckley was in charge of the Freemont office and it is the claim of defendant that he and a Mr. Mills had the transaction with Galbraith and that he inserted the advertisement as his own and, hence, defendant did not participate in any act of using the mails. The provision of this statute is to the effect that it shall be

unlawful for any person in the sale of any securities by the use of any means or instruments of "transportation or communication in interstate commerce or by the use of the mails", directly or indirectly to employ any device, scheme or artifice to defraud. Title 15 U.S.C.A. § 77q (a) 1. Beckley testified that he put the advertisement in the paper "under the direction of First Mortgage Acceptance Corporation", and that First Mortgage Acceptance Corporation paid for the advertisement. On cross examination he testified as follows:

"Q. Mr. Beckley, referring to these two blind ads, I call them blind ads because they give a box number in care of the paper. At whose instance were they put in that paper? A. I did.

"Q. And with whom did you discuss the matter, if with anyone, before you put them in? A. With both Mr. Holmes and Hauser."

He put the ads in the paper but at the direction of the First Mortgage Acceptance Corporation, and the First Mortgage Acceptance Corporation paid for the ads. He was employed by First Mortgage Acceptance Corporation. This testimony shows that defendant was connected with the use of the advertisement and it was in the interest of the business of the First Mortgage Acceptance Corporation.

▇▇▇ But defendant urges that he has been convicted of certain acts that were legitimate and innocent, but the innocent acts referred to are alleged to have been performed for the purpose of executing the scheme, or attempting so to do. Acts innocent in themselves may yet in combination constitute a fraud or attempts to commit fraud. One attempting to commit a fraud may well seek to give the act an appearance of legality and innocence. In fact "if the livery of Heaven were never stolen" but few frauds could be successfully committed. It is not essential that the matter mailed be in itself criminal or objectionable, or that it disclose a fraudulent purpose. Barnes v. United States, 8 Cir., 25 F.2d 61; McNear v. United States, 10 Cir., 60 F.2d 861. We are of the view that the verdict is sustained by substantial evidence.

▇▇▇ Defendant insists that the conspiracy, Count 19, charges the same matter contained in the other counts of the indictment, namely, the "use of the mails in the same alleged continuous scheme". But the conspiracy is a different offense from that charged in the other counts in the indictment. United States v. Robinowish, 238 U.S. 78, 35 S.Ct. 682, 59 L.Ed. 1211; Chew v. United States, 8 Cir., 9 F.2d 348. The overt act need not in itself be a criminal act nor need it constitute the crime that is the subject of the conspiracy. Acquittal of the conspiracy is no bar to the prosecution for the substantive crime even when that was the overt act charged in the conspiracy count. Bell v. United States, 8 Cir., 2 F.2d 543. The count charges 17 separate overt acts while defendant criticizes only four of them. As it is not possible to say which overt acts the jury found to have been committed, no error is made to appear. United States v. Wexler, 2 Cir., 79 F.2d 526.

▇▇▇ Defendant complains that the court did not permit him to testify as to his intent. An examination of the record convinces that he was permitted to offer and did offer a great deal of testimony going to his good faith. He was asked to state whether at any time he intended to defraud any person as a result of any scheme to use the mails to obtain money, or funds, or property from any person in Nebraska, and was allowed to answer this question, which he did in the negative. Evidence was admitted of all the historical details concerning the acquisition and disposition of the properties in question, his belief in the truth of his representations and his lack of intent to defraud. Certain questions were asked to which objections were sustained on the ground that they were leading and suggestive or that they called for self-serving declarations. Objections were also sustained to certain proffered testimony concerning the opinions of unqualified persons on matters in connection with which opinion evidence was incompetent. We do not think defendant's contention that he was not permitted to introduce his own evidence, or that of other witnesses, to show his good faith has any substantial foundation. It is also contended that the court erred in curtailing defendant's cross examination of the witness Ozro Carter, produced by the government. Carter had invested in "participating certificates"; after objections were sustained to certain questions asked him on cross examination relative to whether he had made investigation as to the assets of First Mortgage Acceptance Corporation, defendant offered to prove that Carter "made independent investigations as to the value of the assets of First Mortgage Acceptance Corporation

as disclosed by his direct testimony and upon cross examination this witness would testify in substance that as a result of these inquiries so made by him and so testified to on direct examination, he learned that the assets of the company were adequate to pay out 100% on the dollar". On his direct testimony he had stated that he relied on representations made by defendant and Hauser, as well as upon "statements of some people I had written to previous to making any investment whatsoever". The scope of cross examination is within the judicial discretion of the trial court. Hewitt v. United States, 8 Cir., 110 F.2d 1. It is not apparent that the testimony proffered could have thrown any real light on the question at issue. We think there were no prejudicial errors committed by the court in its rulings on admissibility of evidence.

■ Defendant contends that his business was intrastate, being confined to Nebraska and, hence, the Securities Act of 1933 is not applicable. This Act forbids any person to employ a scheme or artifice to defraud in the sale of securities by the use of the mails or of transportation in interstate commerce. Article I, § 8, cl. 7 of the Constitution vests Congress with power to establish postoffices and postroads. It may, therefore, with propriety exclude matters from the mail that are in furtherance of a fraudulent scheme. Baders v. United States, 240 U.S. 391, 36 S.Ct. 367, 60 L.Ed. 706.

We have considered the general objections aimed at the instructions of the court; they are general and inconsequential. The trial court, we think, fully and fairly instructed the jury.

■■ It is finally urged that the sentence imposed was excessive and, hence, illegal. Defendant was sentenced to imprisonment on the 18 counts for 15 years and to pay a fine of $25,000.00. The Securities Act of 1933 permits a penalty of $5,000.00 fine or 5 years imprisonment, or both, for each offense. The conspiracy statute, Title 18 U.S.C.A. § 88, permits a penalty of $10,000.00 and imprisonment of not more than 2 years, or both. The sentence here was well within the maximum limits. On the prior appeal of this case, in considering this contention, we said: "This court cannot concern itself with the sentence imposed upon appellant. Where a District Court imposes a sentence authorized by a statute of the United States,

it commits no error of law". Holmes v. United States, 8 Cir., 115 F.2d 528, 529. We adhere to this holding.

Being of the view that the record shows that the defendant was ably represented by counsel in the lower court, that he was fairly tried, and that the verdict is sustained by abundant evidence, the judgment appealed from is affirmed.