UNITED STATES of America, Appellee,

v.

**Vernon H. BLUNK, Joe Blunk, and Donna Blunk, Appellants.**

Nos. 76–2066, 76–2051 and 76–2052.

United States Court of Appeals, Eighth Circuit.

Submitted May 16, 1977.

Decided July 27, 1977.

Rehearing Denied in No. 76–2051 and 76–2066 Aug. 26, 1977.

Doris Gregory Black, St. Louis, Mo., on brief, for appellant, Vernon H. Blunk, in No. 76–2066.

Allan Goodloe, Jr., Shaw, Howlett & Schwartz (on brief), Clayton, Mo., argued for appellants, Joseph Blunk and Donna Blunk, in Nos. 76–2051 and 76–2052; Charles M. Shaw, Clayton, Mo., on brief.

Stephen B. Higgins, Asst. U. S. Atty., Barry A. Short, U. S. Atty., St. Louis, Mo., argued and on brief, for appellee.

Before GIBSON, Chief Judge and BRIGHT and HENLEY, Circuit Judges.

BRIGHT, Circuit Judge.

Appellants Vernon Blunk, Joseph Blunk, and Donna Blunk (Joseph's wife) stand convicted of conspiracy to defraud insurance companies and of using the mails in the scheme to defraud. The gist of the charges rests on an alleged agreement among the appellants and one Ronald Waller, an unindicted coconspirator, to stage an automobile accident in order to enable the Blunks, posing as innocent accident victims, to make claims against various insurance carriers through the mails. Upon trial, a jury found appellants guilty on all counts. The district court sentenced Joseph Blunk to concurrent prison terms totaling five years, imposed a similar sentence upon Vernon Blunk, and sentenced Donna Blunk to concurrent terms

totaling three years imprisonment. These timely appeals followed.

We affirm the convictions of Vernon and Joseph Blunk, but reverse Donna Blunk's conviction for insufficiency of evidence.

I. *Factual Background.*

The Government's proof that the Blunks agreed to stage an automobile accident in order to collect benefits under various insurance policies consisted of testimony from the unindicted coconspirator, Ronald Waller, then a truck driver for the Poole Truck Lines, located in Evergreen, Alabama, and the supporting testimony of a woman known as Paula Waller. At all times material, although not married to Ronald Waller, she had been living with him and had borne him a child.

Waller testified that his close friend, Vernon Blunk (also called Steve), accompanied by Vernon's brother, Joe (Joseph), and Joe's wife, Donna, came to Brewton, Alabama, on or about May 12, 1974, and stayed at the home of Ronald Waller and Paula for three days. During that time, the Blunks allegedly solicited Ronald Waller to stage a collision between a truck which Waller would be driving for Poole Truck Lines and a pickup truck in which the Blunks would be riding. Vernon Blunk made the initial proposal to Waller. In the discussion, Vernon Blunk offered Waller $1,500 for his participation. Waller testified that Joe Blunk suggested to Vernon that $1,500 was too much to pay Waller, but Vernon disagreed. There is no evidence that Donna Blunk took part in the discussions, but Waller testified that Donna Blunk "was there also."

The visit at Brewton, Alabama, ended when Waller obtained an assignment from the Poole Truck Lines to drive a tractor-trailer loaded with freight into Pennsylvania. The evidence indicates that Waller had sought such an assignment from his employer after Joe Blunk told him that Pennsylvania would be a good place in which to stage an accident, because insurance carriers usually pay off quickly in that state. All of the alleged conspirators there-

after proceeded on a trip from Alabama to Pennsylvania, driving more or less in convoy, with a pickup truck owned by Vernon Blunk sometimes being driven ahead of Waller's tractor-trailer and at other times driven behind. Vernon Blunk frequently rode in the tractor-trailer with Ronald Waller. On May 17, 1974, in Chester County, Pennsylvania, Ronald Waller carried out the plan to collide intentionally with the Waller pickup. The pickup stopped at the intersection of Highways 10 and 41, and Ronald Waller drove his tractor-trailer rig directly into the rear of the Blunk pickup. Waller also testified that a few moments earlier, as the two vehicles approached the intersection, he had struck the pickup accidentally when the driver of that vehicle suddenly and without warning applied the brakes. Waller described the second impact as an intentional collision. The Blunks testified to only one impact, at the highway intersection.

The three Blunks sustained some injuries, and they were hospitalized for approximately twenty days. Each of them filed claims for medical expenses under various insurance policies, and in addition, all made claims against the liability insurance carrier for the Poole Truck Lines. An adjuster for that insurer made an advance payment of $1,000 to each of these defendants during the time of their hospitalization immediately following the accident. The Blunks also brought a lawsuit in Pennsylvania against Poole Truck Lines to recover for injuries in an aggregate amount in excess of $300,000. That lawsuit was pending at the time the Government obtained this indictment.

The conspiracy came apart in about October of 1974. By this time, Ronald Waller and Paula had separated, leaving Paula in custody of their child. After the child became ill from accidentally eating a number of Tylenol pills, Ronald Waller took the child away from its mother without her permission, and he apparently left the state. The mother became distraught. In an effort to obtain help in recovering her child, Paula contacted Ronald's employer and "spilled the beans," disclosing that Ronald

had told her the "accident" with the Blunks' vehicle had been a planned collision. This disclosure led to an investigation by the liability insurance carrier, which obtained a confession from Ron Waller. Ronald and Paula both testified to the grand jury, which returned the indictment against the Blunks. The prosecutor, in response to an agreement to cooperate, agreed not to bring criminal charges against Waller.

Each appellant attacks the sufficiency of the evidence to sustain his or her conviction, and they raise several other claims of error relating to conduct of the proceedings by the prosecutor and alleged errors by the district court in the reception of evidence and in instructing the jury. We find it necessary to discuss in some detail the sufficiency of the evidence to convict and certain evidentiary rulings. We deem the other claims made by the appellants to be without merit, bordering on the frivolous.

II. *Sufficiency of the Evidence.*

■ A review of the record indicates more than ample evidence to sustain the convictions of Vernon and Joseph. Vernon is implicated in the scheme through testimony of coconspirator Ronald Waller and also testimony of Paula Waller. Joseph Blunk is also implicated in the conspiracy through the testimony of Ronald Waller. In addition, Paula testified that during the time that the Blunks visited the Waller home in May of 1974, Ronald told her that Vernon and Joseph had asked that he, Waller, participate in staging of an automobile accident.

The defendants each testified. They did not dispute the details of the convoy-journey from Alabama into Pennsylvania to the place where the collision occurred. Vernon and Joseph Blunk, who were engaged in a cattle-raising venture on a farm in Missouri, testified that they drove to Pennsylvania for the purpose of possibly buying a Charolais bull which a Pennsylvania farmer had advertised in a farmer's paper. Donna Blunk testified that she understood the trip was made for the purpose of buying such a bull. The only other conflict in the testimo-

ny relating to the trip to Pennsylvania was whether there were two impacts, as testified to by Waller, or only a single impact at the intersection of the highways, as testified to by the Blunks.

The jury obviously chose to believe Ronald Waller's testimony, and as we have noted, Paula Waller's evidence corroborated that of Ron Waller in important particulars. Moreover, the undisputed circumstances which induced her disclosure of the conspiracy to the Poole Truck Line add a substantial measure of veracity to her version of events.

We are satisfied from our review of the record that the prosecution presented substantial evidence that Joseph Blunk and Vernon Blunk entered into an illegal agreement with Ronald Waller for the purpose of obtaining monies by fraud from the several insurance companies.

Donna Blunk's claim of insufficiency of the evidence to support her conviction presents a close question. Ronald Waller's description of Donna Blunk as being "there also" while the plans for the accident were discussed does not establish with any degree of certainty that Donna Blunk knowingly participated in the agreement to stage an accident. We quote a portion of the testimony:

Q (By Mr. Staples) [prosecutor] Ronnie [Waller], *after you had this first conversation with Steve* [Vernon] [relating to staging an accident], were you promised anything?

A [Ronald Waller] Yes, sir.

Q What was that?

A $1,500.

Q By whom?

A Steve [Vernon].

Q Where was Joe Blunk when this happened?

A I believe we were in the kitchen of my house. I'm not sure.

Q So Joe was in the general vicinity?

A Yes, sir.

Q Did you hear Joe Blunk make any statement at this point?

A Yes, sir.

Q  Who did he make it to?

A  To Steve.

Q  What did he say to Steve?

A  He said that was too much.

Q  Too much what?

A  Too much money.

Q  And did Steve respond?

A  As well as I can remember, I believe he said it wasn't.

Q  Where was Donna Blunk at this point?

A  She was there also.

(Emphasis added).

The conversation testified to occurred *after* Vernon asked Ronald Waller to stage the accident. There is nothing in this testimony indicating that Donna was present when Joseph or Vernon suggested staging an accident, or that she knew why Waller was to be paid money.

At another point in the trial, when counsel for Joseph and Donna Blunk cross-examined Ronald Waller about the conversation relating to staging the accident, Waller stated he had been questioned at various times by all three Blunks before the incident in the kitchen related in the testimony quoted above. That testimony reads as follows:

Q  *  *  *  Now, I believe you testified here, Mr. Waller, that it was in the kitchen of your home, is that correct, that your words were, "It was in the kitchen of my house," when you were approached about this staging an accident, as you said?

A  The second or third time?

Q  Oh, you were questioned several times before, were you, about it by one of the Blunks?

A  Yes, sir.

Q  By which Blunk?

A  Well, by all three at different occasions.

Q  Well, when was the first occasion that any of the Blunks mentioned anything to you about staging an accident?

A  In the truck coming from Evergreen, Alabama to Brewton.

Q  Who was with you?

A  Steve Blunk.

Q  And about when was that?

A  I don't know approximately.

Q  Well, would you know what year it was?

A  I believe it was '74.

Q  You believe it was '74?

A  I'm not positive.

Waller never did specify the contents of any discussion between Donna Blunk and himself. Waller's statement that he was questioned by "all three at different occasions" could, on the basis of this record, mean only that Donna was present during conversations about some aspects of the scheme which, by themselves, would not make Donna aware of the fraudulent agreement, such as the discussion of payments to Waller dealt with above.

The Government also introduced additional evidence bearing on Donna's knowledge of any agreement to create an accident. Paula testified that Ronald Waller asked her advice as to whether he should enter into an arrangement to make some money through an automobile accident. She expressed violent objections. On the next night, Waller told her that "Steve and Joe *  *  * had asked him to go into this accident together *  *  * and that they weren't letting the women know *  *  *. He was just wanting my opinion." Under cross-examination, she added the following:

Q  Now, according to what you told us here, at no time did you ever hear Donna say anything at all about any kind of an accident before any accident happened. Isn't that right?

A  That's right.

Q  And you mentioned something about the kitchen. Now, I'm going to use the word "day three". I believe you said day three. I only use that because that's the word you used.

A  Okay.

Q  And you said something about some people being in your kitchen?

A  Yes.

Q  Now, Donna was not in the kitchen when according to you there was a discussion about something?

A That's right. She was playing with my children.

Q She was taking care of your two children in the other room; isn't that right?

A In the living room.

Q So if, as you say, anything at all was said about an accident, she wasn't there. Isn't that right?

A She wasn't ever in there when we were discussing it. I never heard her say a word about it.

Q You never—you don't even know if she even—if what you say is true, nevertheless, at no, you don't have any idea whether or not she knew anything at all about it. Is that right?

A That's right.

Q To your knowledge she knew nothing about it?

A That's right. As far as I know of because Ronnie told me that Steve's wife didn't know anything and that Donna didn't know anything but, of course, that's him telling me. But I never heard her say it and she never discussed it with me.

Before leaving their home at Brewton, Ron Waller stated that he did not know whether or not he would go through with the accident arrangement. Two or three days later he called his wife over the telephone and advised her of the "accident" and said that "nobody was hurt * * *."

The Government also proved that Donna Blunk made claims for insurance benefits under several policies and indeed, collected from some of these companies. This evidence, however, does not prove any illegal conduct on her part unless the Government also proved that she knew that the collision had been staged. This is so because the prosecution concedes, and the evidence shows, that Donna did in fact sustain some injuries in the accident which, absent her participation in the conspiracy, would justify her collection of benefits from the insurers.

Undoubtedly the jury rejected the Blunks' alleged reason for travelling into Pennsylvania. However, that the reasons advanced by the Blunks for going into Pennsylvania may have been untrue does not establish that Mrs. Blunk knew the real reason for the trip into Pennsylvania. The Government produced no evidence establishing either that Donna Blunk expressly agreed to participate in the planned accident or that she actually overheard Vernon and her husband making arrangements with Ronald Waller to stage the accident. Waller's testimony that Donna "was there also" when Waller was offered money for his participation in the scheme is reason to suspect Donna may have known about the illicit agreement, but is not sufficient to prove that fact beyond a reasonable doubt. To convict a criminal defendant, the evidence must do more than merely raise suspicion or the possibility of guilt. The evidence is simply insufficient to prove beyond a reasonable doubt that Donna knowingly participated in the conspiracy. Accordingly, we reverse Donna's conviction. *See United States v. Jones*, 545 F.2d 1112, 1115–16 (8th Cir. 1976), *cert. denied*, 429 U.S. 1075, 97 S.Ct. 814, 50 L.Ed.2d 793 (1977); *United States v. Kelton*, 446 F.2d 669 (8th Cir. 1971).

III. *Evidentiary Claims.*

Appellants claim that the court erred in certain evidentiary rulings. We here address the claim that the district court committed prejudicial error in permitting the prosecutor to establish through cross-examination of Vernon Blunk that a Pennsylvania lawyer representing the Blunks in their $300,000 civil lawsuit had written Blunk's local counsel in Mississippi questioning the validity of the Blunks' claims against the Poole Truck Lines and suggesting that he would withdraw from the action unless all three Blunks submitted affidavits denying the allegations of fraud.

Vernon Blunk stated on direct examination that to his knowledge, the lawsuit in Pennsylvania had never been withdrawn and that he had never authorized any of his lawyers to withdraw that lawsuit. On cross-examination the prosecutor asked:

Q Mr. Blunk, isn't it a fact that on August the 13th, 1976, Mr. David Forage, a member of the Pennsylvania Bar wrote Robert Mills, the attorney, you know, in Mississippi, and asked for a frank denial of the allegations [of fraud]?

After objection, the question was rephrased, as follows:

Q Mr. Blunk, did you receive a carbon copy of a letter sent to you by certified mail from Mr. Robert Mills, attorney from Lost Point, Mississippi, dated August 27, 1976, requiring you to, or asking you to fill out an affidavit about this civil suit?

The witness responded that he had received the letter after his arrest on the charges considered here. Appellants contend that the disclosure of this letter's contents violated the attorney-client privilege and that the contents of the letter were inadmissible hearsay. The Government responds that the evidence served a proper impeachment purpose in establishing the falsity of Vernon Blunk's testimony that the lawsuit in Pennsylvania was never withdrawn and that he had never authorized such action.

An examination of the transcript establishes that the information in this letter did not impeach the direct testimony of Vernon Blunk. In the direct examination, counsel was seeking to show, through Vernon's answers, Vernon's innocent state of mind. The letter in question, however, referred to his Pennsylvania lawyer's state of mind in questioning the validity of that lawsuit, apparently after details of the alleged conspiracy had been disclosed to him. Disclosure of this letter's contents on cross-examination did not constitute proper impeachment. The letter's contents amounted to a statement by a person not present and under oath, and was therefore inadmissible hearsay. Moreover, the lawyer's opinion on the merits of the lawsuit was not relevant to any issue in this case.

We cannot say, however, that the error was of such a prejudicial nature as to require a retrial. The cross-examination in question related to the good faith of the appellants in bringing the lawsuit. That subject was injected into the trial by the direct testimony of appellant Vernon Blunk. Moreover, we do not believe that the introduction of this hearsay comment was significant in light of the overwhelming evidence establishing that Joseph and Vernon Blunk did conspire with Ronald Waller to stage an automobile accident.

Appellants' complaint of error regarding the admission of testimony by Lynn Greer, an insurance adjuster who had interviewed Joe Blunk shortly after the accident, does not justify reversal. Greer testified that Joe Blunk did not tell him that he knew the driver of the tractor-trailer. However, Greer's subsequent testimony indicated that he had not asked Blunk about any acquaintance with the driver of the tractor-trailer. In light of this admission by Greer, the questioned evidence, if erroneously admitted, did not prejudice the defense.

### IV. Other Contentions of Error.

We briefly comment upon other claims of appellants.

■ Vernon Blunk's contention that the prosecution should have been dismissed for prosecutorial delay focuses on a delay of approximately eleven months between October 1975, when the Poole Truck Lines learned of the conspiracy, and September 1976, when appellants were indicted. Knowledge by the Poole Truck Lines of the conspiracy does not constitute knowledge by the Government and its prosecutors. The record shows neither intentional prosecutorial delay nor prejudice to appellant Vernon Blunk. Thus, his contention must be rejected. See United States v. Lovasco, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977).

■ The court committed no prejudicial error in its reasonable doubt instruction, see United States v. Collins, 552 F.2d 243, 248 (8th Cir. 1977); United States v. Knight, 547 F.2d 75 (8th Cir. 1976); United States v. Kirk, 534 F.2d 1262, 1279 (8th Cir. 1976); United States v. Conley, 523 F.2d 650, 655 (8th Cir. 1975), cert. denied, 424 U.S. 920, 96 S.Ct. 1125, 47 L.Ed.2d 327 (1976), nor in the

instructions relating to the Government's obligation to prove a sufficient number of fraudulent representations "to satisfy * * beyond a reasonable doubt that the scheme and artifice alleged was, in fact, developed," see, e. g., Schaefer v. United States, 265 F.2d 750, 753–54 (8th Cir. 1959); Holmes v. United States, 134 F.2d 125, 133 (8th Cir. 1943); cf. Myrick v. United States, 332 F.2d 279, 281 (5th Cir. 1963).

We have otherwise reviewed the instructions in this case, some of which have been challenged by appellants. As a whole, the instructions are adequate and fairly presented the issues to the jury.

■ Appellants have also presented a number of challenges to the pretrial disclosures made to the defendants pursuant to the orders of the district court. We find no misconduct on the part of the prosecutors in carrying out its disclosure policies. We are satisfied that the prosecutors made adequate and proper disclosures of information to appellants either before or at trial.

■ The district court also did not abuse its discretion in failing to grant Joseph Blunk a severance, in light of the common factual issues involved in the charges against each defendant and the lack of any particular prejudice to Joseph's defense.

Accordingly, the judgments of conviction of Joseph and Vernon Blunk in Nos. 76–2051 and 76–2066 are affirmed; the judgment of conviction of Donna Blunk in No. 76–2052 is reversed.